IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF KANSAS

| | |
|---|---|
| **Phillip Michael Eravi** | |
| PLAINTIFF | |
| v. | |
| **Kelly Jones,** *in her individual capacity* as former USD497 President of the Board of Education the Lawrence Kansas School District | Case No. |
| * | |
| **Ronald Gordon-Ross** *in his individual capacity* as USD497 President of the Board of Education the Lawrence Kansas School District | Jury Trial Requested |
| * | **COMPLAINT** |
| **Bailey Salsbury** *in her individual capacity* as police officer for the City of Lawrence | |
| * | |
| **Lindsay Bishop** *in her individual capacity* as police officer for the City of Lawrence | |
| * | |
| **Jeanice Kerr Swift,** *in her individual capacity* as Superintendent of Schools Lawrence Public Schools | |
| * | |
| **Unified School District No. 497, Douglas County, Kansas** | |
| DEFENDANTS | |

## OVERVIEW

**USD497 PROPERTY IS PUBLIC PROPERTY – IT BELONGS TO THE PEOPLE, NOT TO ANY ONE OFFICIAL**

**1.** USD 497 property is public property – not the personal domain of any one individual. Yet Defendant Superintendent Jeanice Swift has exercised authority as though she governs a private estate, unilaterally and without legal basis banning

individuals from public property, including Board meetings and other school-related events open to the public.

**2.** Superintendent Swift is not the legal owner, custodian, or controlling sovereign of USD 497 public facilities, nor does she possess unilateral authority under law to permanently ban members of the public from traditional or designated public forums. Nevertheless, she has acted beyond her constitutional and statutory authority to silence and remove critics, targeting Plaintiff for his protected speech.

**3.** These actions constitute a misuse of governmental authority, violating the First Amendment rights of free speech and petition, and the Fourteenth Amendment guarantee of due process. Plaintiff's speech at open public meetings, conducted during his allotted time, was peaceful and related to matters of public concern—including school policies, library content, and board governance.

**4.** In retaliation for this protected speech, Defendants, acting under color of state law, issued a lifetime "No Trespass" ban, enforced by armed law enforcement officers, and applied without notice, hearing, due process, or lawful justification.

**5.** These unconstitutional actions reveal a custom, policy, and practice of censorship, viewpoint discrimination, and retaliatory enforcement of speech restrictions—none of which were properly adopted by the Board in accordance with Kansas open meetings and policy requirements.

**6.** This lawsuit seeks declaratory, injunctive, and monetary relief for the violations of Plaintiff's constitutional rights under 42 U.S.C. § 1983, including damages and attorney fees as allowed under 42 U.S.C. § 1988.

### THE TWO-STRIKES-AND-THE-DEATH-PENALTY PRACTICE

**7.** Citizens who dare to speak candidly to USD 497 Board members – particularly when their speech exposes or embarrasses the district – do so at their own peril. Merely repeating offensive or pornographic content from books in the district's own libraries can—and will—result in a lifetime ban, not only from Board meetings but from all USD 497 public property. The district has adopted an arbitrary, ad hoc "speech code" that allows speakers one so-called 'disrespectful' or 'ugly' word before issuing a vague and baseless "warning." These warnings are procedurally hollow: the speaker is never told what specific word or phrase violated what specific rule—because no such formally adopted rules exist. Upon uttering a second supposedly "foul" or "disrespectful" word – again, undefined – the speaker is immediately silenced. Their microphone is cut, their remaining speaking time forfeited, and they are expelled from the meeting—either by forced disconnection (for remote speakers) or under threat of physical removal by police. This lawsuit exposes that USD 497 does not possess lawful authority to impose such sweeping speech restrictions, especially when no formal policy has been debated or approved by a proper quorum of the Board. These unconstitutional practices reach even further: speakers are preemptively sanctioned when the presiding Board member merely anticipates they might say something disfavored. Even a speaker stating that they intend to quote from district-approved library books can trigger a warning, and a second such "offense" results in what amounts to a speech "death penalty"—removal from the meeting and the premises. The Board's reliance on vague, subjective terms like "disrespectful" speech

– without clear standards or definitions – creates a viewpoint-based restriction that allows "respectful" (*i.e.*, flattering or agreeable) speech while censoring dissent or criticism on the same topic. Such selective enforcement is not only profoundly undemocratic—it is a blatant violation of the First Amendment.

### STUDENTS SHOULDN'T HEAR WORDS SPOKEN TO THE BOARD THAT THEY READ IN USD 497 LIBRARY BOOKS?

**8.** The hypocrisy and pretext underlying USD 497's censorship policies are glaring. The Board claims that its "say-only-nice-words" and "no-bad-words" rules during public comment periods are necessary to maintain decorum – particularly because "students may be in attendance or watching online." But this justification is nothing more than virtue signaling and political theater. The truth is far more disturbing: the very words and themes that the Board censors at public meetings are freely accessible to students – including children as young as six years old – through the district's own library materials. These materials include graphic and explicit content, including visual depictions of child sexual abuse and pedophilia, content so graphic and unsettling that it is arguably too indecent to be fully described in this complaint. This contradiction reveals that the district's true motive is not the protection of children, but the silencing of criticism. The Board permits such materials to circulate within its schools but punishes adults who dare to read or reference them aloud in a public forum. This selective enforcement lays bare a policy based not on safeguarding minors, but on controlling speech and suppressing dissenting viewpoints – a clear violation of the First Amendment.

**9.** USD 497 enforces vague and arbitrary speech rules under the pretense of regulating "obscenity," which it ambiguously equates with undefined "foul language." But what qualifies as "foul" appears to be purely subjective, left entirely to the whims of whoever is presiding. The hypocrisy is striking: when members of the public quote back to the Board the very same language – verbatim – that the district provides to first, second, and third graders in school libraries and curriculum materials, that speech is prohibited. The Board has repeatedly banned adults from quoting that content to other adults during public comment at open meetings. Yet, as recently as August 25, 2025, the Board permitted a speaker to read aloud graphic depictions of various sexual acts from books available in district libraries. However, when that same speaker attempted to cite objective statistics – such as the number of times words like "fuck" or "shit" appear in a specific book – the presiding officer abruptly censored the speaker and cut the Webex connection before their speaking time had expired. This selective and inconsistent censorship exposes the Board's policy as not only incoherent but fundamentally viewpoint-based. It allows graphic sexual content to be quoted when done in a way that appears acceptable to the Board, but shuts down factual, critical speech that highlights the extent of vulgarity through quantifiable means. This is not the regulation of obscenity – it is the regulation of dissent. And it violates both the spirit and the letter of the First Amendment.

**LAWRENCE POLICE ARE LITTLE MORE THAT ITS MEETING BOUNCERS FOR USD497**

**10.** USD 497 has effectively deputized the Lawrence city police as enforcers of its unlawful speech restrictions – treating public meetings like a private bar ejecting

patrons for saying something unpopular. But unlike a rowdy bar removing intoxicated or violent customers, the individuals expelled from USD 497 meetings have committed no crime, posed no threat, and engaged in no disorderly conduct. Their only offense is expressing disapproved viewpoints or using words the Board finds uncomfortable – speech that is squarely protected under the First Amendment. This Board has not only embraced censorship, it has granted quasi-judicial powers to the Superintendent, elevating her to judge, jury, and executioner in what can only be described as a modern-day Star Chamber. She wields unilateral and unchecked power to issue "no trespass" orders – effectively banishing individuals from all USD 497 property – not based on law or safety, but on personal or political disapproval.

Worse still, these officials behave as though they possess the same authority as private property owners, claiming the power to exclude members of the public from public spaces – indefinitely and without due process. In doing so, they act as though they can excommunicate citizens from public forums that are open and accessible to everyone else. This is not merely an overreach of power; it is a constitutional crisis at the local level, and a direct assault on the fundamental rights of free speech, due process, and public participation in democratic governance.

**11.** At the heart of this lawsuit lies a fundamental and alarming misunderstanding by USD 497 officials: the legal distinction between public and private property— especially as it relates to the law of criminal trespass. Unlike private property owners, government officials do not have unrestricted authority to exclude individuals from public property simply because they disapprove of their presence,

viewpoints, or speech. Public property – especially spaces explicitly opened for public comment, such as school board meetings – are subject to constitutional protections. The Board's actions demonstrate a gross misapplication of trespass law, treating disagreement or discomfort as grounds for exclusion, and wrongly asserting powers that simply do not exist in the public context. In doing so, USD 497 has weaponized the concept of trespass as a tool to silence critics and suppress constitutionally protected speech.

**INFORMING THE PUBLIC AND BOARD ABOUT THE PORNOGRAPHIC LITERATURE BEING GIVEN TO STUDENTS IS A MATTER OF GREAT PUBLIC CONCERN**

**12.** This is not Carrie Schmidt's, Michael Eravi's, or Dr. Spiehs' first rodeo. Ms. Schmidt has been active in addressing school curriculum and Kansas District Judge Eric Melgren recently ruled that the Gardner School district's ban against her was unconstitutional in *Schmidt v Huff*, No. 25-CV-2081-EFM-GEB 2025 WL 901335 (Kan.D. 3/25/2025).

**13.** Ms. Schmidt was banned from Gardner school property. Judge Melgren held that the ban was unconstitutional. *Id*. at *4. Ms. Schmidt was prohibited from repeating words that are available in the Gardner library curriculum at the school board public comment section to its public meetings unless she claimed she was quoting from a book.

**14.** Michael Eravi is a citizen journalist.

**15.** Dr. Justin Spiehs is a citizen journalist.

**16.** Similar to Ms. Schmidt, Mr. Eravi, and Dr. Spiehs saying words from the library books contained in the USD497 curriculum, all were censured for repeating those words contained in USD497 curriculum including its library books.

**17.** Ms. Schmidt, Dr. Spiehs, and Mr. Eravi were all interrupted, sanctioned, and censured similar to the Brevard County mother who was interrupted by a board member before she could even start. *See Moms for Liberty v. Brevard Pub. Sch.,* 118 F.4th 1324, 1331 (11th Cir. 2024).

**18.** USD 497 school district is governed by the Board of Education for USD 497 which conducts its meetings open to the public.

**VAGUE AND UNCONSTITUTIONAL POLICIES**

**19.** USD 497 enforces speech restrictions at its public meetings that have never been formally adopted through a valid vote by a quorum of the Board. These censorship rules—unpublished, unwritten, or vaguely referenced—are applied arbitrarily and without notice. A troubling new custom or informal policy has emerged: members of the public may quote graphic content directly from books in the district's libraries, but if a speaker merely describes that same content using identical language, they are censored, sanctioned, and removed. This contradictory enforcement not only lacks any legal basis, but also highlights the Board's inconsistent and viewpoint-driven application of its rules. The Board does publish some minimal meeting guidelines— such as the three-minute speaking limit—but these do not include any specific, formally adopted prohibitions on speech content. Yet, speakers are routinely punished based on undefined, unwritten, and selectively enforced standards,

8

effectively transforming a public meeting into a forum for permitted praise but prohibited criticism. The Board publishes the following restrictions which include a three minute speaking time:

> This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policies KN and GAE (General Complaints and Personnel Complaints). The board president or presiding officer of the meeting may direct that a public comment request be redirected to staff to comply with board policy, including and/or to protect the privacy of individual staff or students. If you need assistance in sharing a complaint or concern with district staff, let the board clerk or other district staff know.

> Topics discussed in public comment shall be germane to the business of the board. Furthermore, comments must comply with standards laid out in Board Policy GAAE and Board Policy JGECA (Antibullying and Hazing of Staff and Students). Comments or acts that are threatening to staff, the board, or others in attendance, including the use of language or behavior that is disruptive of the board meeting, will not be permitted during public comment. In addition, because students may be in attendance or watching online, members of the public will refrain from using foul or obscene language.

20. The Board's prohibition on "complaints about specific staff or students" clearly targets and suppresses negative speech, while allowing positive or favorable remarks about the same individuals. This is classic viewpoint discrimination, which is unconstitutional under the First Amendment. Furthermore, the term "business of the Board" is left completely undefined, providing no meaningful guidance to the Board president or presiding officer tasked with enforcing these vague restrictions. This lack of definition creates a blank check for censorship, enabling the arbitrary suppression of speech based solely on the presiding officer's subjective interpretation.

21. The Board president or presiding officer at meetings is given no clear guidelines or objective standards for identifying what constitutes a "complaint," "obscene," or

"foul" language. This complete lack of definition empowers the presiding officer to arbitrarily and subjectively censor speech, undermining fair and consistent enforcement of the rules and chilling protected expression.

**22.** The GAAE policy "prohibits bullying in any form, including electronic means, on or while using school property, in a school vehicle, or at a school-sponsored activity or event by any student, staff member, or parent towards a student or staff member."

**23.** There are no guidelines provided to the Board president or presiding officer to define what constitutes "bullying", whether in conduct or speech. This lack of definition leaves the determination entirely to the subjective discretion of the presiding officer, allowing for unpredictable and inconsistent enforcement that chills protected expression.

**24.** The Board offers no explanation for why its prohibition on "bullying" is narrowly limited to students, staff members, and parents, while effectively permitting bullying behavior by all other individuals—including Board members themselves. This selective and unexplained limitation reflects arbitrary enforcement and creates a double standard that undermines the integrity and fairness of the Board's own policies.

**25.** The JGECA policy concerns "Hazing and Bullying" and "hazing" is defined as "any act that recklessly or intentionally endangers the mental health, physical health, or safety of a student for the purpose of initiation or as a condition or precondition of attaining membership in, or affiliation with, any district-sponsored activity or grade level attainment. This includes, but is not limited to: forced consumption of any drink,

alcoholic beverage, drug, or controlled substance, forced exposure to the elements, forced prolonged exclusion from social contact, forced sleep deprivation, assignment of pranks or other activities intended to degrade or humiliate."

**26.** It defines "Bullying" as having "the meaning ascribed to it in Kansas law, and that recklessly or intentionally endangers the mental health, physical health, or safety of a student or employee or that substantially interferes with a student's educational benefits, with a student's or employee's opportunities or performance, that takes place on or immediately adjacent to district grounds, at any district-sponsored activity, on district-provided transportation, or at any district bus stop, and that has the effect of physically harming a student or damaging a student's property; threatening or knowingly placing a student in reasonable fear of physical harm to the student or damage to the student's property or causing substantial inconvenience; taunting, teasing, or intimidation that is so severe, persistent, or pervasive that it creates an intimidating or threatening educational environment or it substantially disrupts the orderly operations of the district."

**27.** The JGECA policy defines "third parties" to "include, but are not limited to, coaches, school volunteers, parents, school visitors, service contractors, or others engaged in district business, such as employees of businesses or organizations participating in cooperative work programs with the district and others not directly subject to district control at interdistrict and intradistrict athletic competitions or other school events."

**28.** The JGECA policy then identifies the individuals to whom the "Prohibited Conduct" is imposed upon: "Bullying of employees is prohibited by district policy. Any student, district employee, or third party who engages in prohibited conduct as above described shall be subject to disciplinary action, which may include, but not be limited to, termination from employment, or expulsion from school, or exclusion from all district property and programs and from doing business with the district."

**29.** It is unknown as to the why USD497 has any significant governmental interest in applying JGECA or GAAE policy to public speakers at its open meetings when both policies contain numerous omissions and exceptions to the application of those policies.

**30.** USD 497 has no significant governmental interest in prohibiting "foul language" from public speakers at its meetings—especially when that very language is permitted and even used freely by other individuals addressing the Board, by the Board members themselves, and when it is openly distributed to minor students throughout the district. This blatant inconsistency exposes the Board's speech restrictions as arbitrary, discriminatory, and lacking any legitimate governmental justification.

**31.** When the Board president or presiding officer declares, "this is your warning," the speaker is not informed of which specific policy or rule has been violated, nor is the speaker told which particular provision or speech is the basis for the alleged violation. This complete lack of transparency leaves speakers unable to know or

defend against the charges, denying them fair notice and due process, and chilling protected speech.

**32.** During its regular meetings, the Board receives reports and other information from USD 497 employees, including the former superintendent Anthony Lewis and new superintendent Jeanice Swift.

**33.** School administrators regularly recognize employees by name during public portions of the Board's open meetings.

**34.** The Board provides time for public comments at its regular meetings.

**35.** The Board has adopted a policy that restricts what citizens can talk about during the public-comment period, which it calls the BCBI policy.

**36.** The Board gives the Board president discretion to decide whether or not comments violate the Board's policy.

**37.** The Lawrence City Police have established a custom, practice, or policy of taking directives, requests, or orders from the USD 497 School Board to remove individuals from public meetings—regardless of whether any crime has been committed—based solely on alleged violations of USD 497 Board policies. This practice effectively deputizes law enforcement as enforcers of the Board's vague and unconstitutional speech restrictions, raising serious concerns about abuse of power, due process violations, and the suppression of constitutionally protected expression.

**38.** Under this policy, the Lawrence City Police, despite an individual having committed no crime and posing no threat to the safety of others, will issue a trespass warning to any person directed to leave public property by the Board. Should the

individual refuse to comply, this policy authorizes police officers to arrest the person for trespass – effectively criminalizing protected speech and peaceful presence on public property.

**39.** This policy, custom, and practice – granting Board members or Superintendent Swift the power to trespass individuals from public property solely because of their protected speech, and deputizing City police officers as enforcers who arrest those individuals – is unconstitutionally void and unenforceable. It violates the First Amendment rights of free speech and petition, as well as the Fourteenth Amendment's guarantee of due process by enforcing vague and arbitrary rules that chill fundamental constitutional freedoms.

**40.** The City of Lawrence Police have been reduced to little more than bouncers at a private establishment, tasked with excluding patrons from public property—not for any legitimate legal reason, but simply at the whim of a single Board member or Superintendent Swift. This abdication of law enforcement's constitutional duties represents a blatant disregard for well-established First Amendment protections and undermines the very principles of free speech and public accountability that our democracy depends on.

**41.** Under the defendant Lawrence School Board Policy Manual, Section B - School Board Operations, Code BCAE, it states:

BCAE - Public Hearings
The board of education may hold public hearings on matters which the board deems appropriate. The board will normally hold public hearings before acting to change attendance center boundaries or holding a bond election.
Kansas statute requires a hearing when closing school buildings.

Public hearings will be held at a convenient time and a suitable place. The board may hold more than one (1) hearing at different times and places.
The board will determine who shall preside at such hearings and will request every participant to state his name, residence, and purpose for speaking. The procedure governing public participation at board meetings is found in Board Policy BCBI.

**42.** The BCAE specifically states that the "procedure governing public participation at board meetings is found in Board Policy BCBI."

**43.** Under Lawrence School Board Policy Manual Policy  B, School Board Operations, Public Participation, Code BCBI, it references the Kansas Open Meetings Act (KOMA), KSA 75-4317. BCBI states the following:

BCBI - Public Participation

The general public will be invited to attend all board meetings, except executive sessions. At each meeting of the board, the president or the presiding officer of the board shall welcome all visitors to the board meeting.

At each regular board meeting, the agenda may include a time for public comment. During that time, the board president or presiding officer may invite to speak those patrons who have requested in advance to participate in the public comment period. The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself. The board president or presiding officer may impose a limit on the time a visitor may have to address the board and the total time devoted to public comment at any given meeting. The board president may ask groups with the same special interest to appoint a spokesperson to deliver the group's message. Except to ask clarifying questions, board members shall not interact with speakers during public comment.

Board work sessions and board-appointed committees meet for a specific purpose or for the completion of a previously scheduled agenda. These are open meetings at which the public is welcome. Time for public comment at these meetings is at the discretion of the chairperson or at the direction of the board.

Written public comment may be submitted to the board at any time.

**44.** The Board president has communicated both verbally and through consistent practice that compliments and congratulations directed toward employees are welcome and permitted during open meetings.

**45.** Video recordings exist for every open meeting since January 1, 2021, providing a clear and objective record of the Board's enforcement practices.

**46.** During this entire period, the defendant Board president has never interrupted or stopped a speaker from making positive comments about students or staff at the Board's open meetings, further illustrating the Board's selective enforcement and viewpoint discrimination against critical or negative speech.

### USD497 MEETINGS, CENSORSHIP, WARNINGS, REMOVALS, AND BANISHMENTS

### JANUARY 13, 2025 MEETING

**47.** On January 13, 2025, Mr. Eravi emailed each of the board members that "I will be in attendance at the next USD 497 school board meeting. I will use language you may find objectionable. Should you decide to create a scene over it, you will create much more than simply a scene. You CANNOT limit speech of an individual. There are a few people in this community that will teach you this constitutional lessen eventually. I <u>am</u> Cohen and this is California."

**48.** USD 497 uses an online platform called "Webex" to allow public viewing and participation in open meetings. For a time, this privilege was open to all individuals who requested access. However, USD 497 later changed its policy and restricted Webex participation to a select class of individuals—those with "legal justification" or those who have been trespassed from USD 497 property. At certain points, USD

497 entirely eliminated Webex access for some individuals, requiring them to participate in person instead. Yet, Dr. Spiehs, Ms. Schmidt, and Mr. Eravi are not permitted to appear in person like other members of the public. This exclusion effectively silences their voices and denies them meaningful access to participate in public discourse.

49. While Webex may be viewed as a form of punishment for those who have been trespassed or banned from in-person attendance, it also represents a limited benefit, especially in situations like inclement weather where personal appearance is difficult or unsafe. Although a Webex appearance does not provide all the advantages of being physically present, it can still be considered preferable to complete exclusion.

50. However, when some speakers used Webex, the Board failed to provide audio to the remote speaker. As a result, when the presiding Board member interrupted or issued warnings during the meeting, the Webex speakers could not hear these interruptions or warnings in real time. The transcriptions of meetings on January 27, 2025, and February 10, 2025, included in this Complaint, reflect only the post-recorded proceedings and do not accurately represent what the speakers actually heard during their participation.

51. The Board changed that in May of 2025 to allow a speaker to hear audio. Individuals can then appear remotely by this online videoconferencing platform. The individual has not control over the volume or imagery and is at the mercy of USD497 regarding what is shown and heard via Webex.  USD497 retains sole power to mute or terminate the Webex connection without the consent of the individual.

**52.** On January 13, 2025, Dr. Justin Spiehs appeared at a Unified School District No. 497, Douglas County, Kansas, open meeting by Webex when it was his turn.

**53.** When an individual appears by Webex that individual cannot see the Board's timer which is being displayed in the meeting room big screen TV. As opposed to a person appearing in person, the individual appearing by Webex is not given real time notice of when the timer starts or what the timer shows. A timer appeared after August 11, 2025.

**54.** The details of the actual time displayed is not decipherable on the replay of the meeting published online.

**55.** The Board has oversight over the curriculum in the school district. Put another way, it is the business of the board to exercise oversight and review of all school curriculum.

**56.** Dr. Spiehs appeared before the Board via Webex and spoke during his allotted speaking time. He spoke on the topic of the Board's policy regarding foul language. Dr. Spiehs stated "When I read that I was thinking to myself isn't that some shit? I mean just think about it, who the fuck is going to define what foul language is?"

**57.** Presiding board member Kelly Jones interrupted Dr. Spiehs and asked if he could refrain from using any more "obscene language." Given that the defendant Jones asked but did not order Dr. Spiehs, he continued: "Oh, fuck no. My first amendment rights don't stop just because of that. So I think that just confirms what I was thinking, I was thinking isn't that some shit well it's actually now that I think about it it's bullshit. You can't say what words we're not allowed to speak here and come

18

out of our mouth no matter what your ruling is for it. And so if you try to do that it just confirms even more how authoritarian you bitches are. Every single last one of you going to sit up there and try to say what words can come out of people's mouths and..."

**58.** The defendant Jones interrupted and said "Dr. Spiehs, you have 27 seconds remaining and in that 27 seconds there should not be any additional obscene language." Dr. Spiehs used other words including "complete bullshit" and the defendant Jones said "Dr. Spiehs you cannot use foul language when you are addressing this board" and disconnected Dr. Spiehs even though he had remaining time to speak.

### JANUARY 27, 2025 MEETING

**59.** On January 27, 2025, Dr. Spiehs was invited by Kelly Jones to speak during the public comment section of the Board's open meeting. As Dr. Spiehs was about to begin speaking, board member Anne Costello interrupted the meeting and called Dr. Spiehs "Crazy Justin Spiehs" using her microphone for everyone attending and viewing the meeting to hear. The Board members do not call out other members of the public who are speaking in such a derogatory manner.

**60.** Dr. Spiehs read from a book from the USD 497 school libraries titled "The Hate You Give." From the school library book he read the following: "Who gives a fuck? Fuck. Seven croaks...." Unknown to Dr. Spiehs, the Presiding officer Jones interrupted Dr. Spiehs slamming her gavel and said "That's your warning." But the speech of defendant Jones was not transmitted to Dr. Spiehs in real time.

**61.** Unaware of any warning, Dr. Spiehs continued reading verbatim from book the word "fuck" in various places in the book and then told the Board "So this book is in your library..."

**62.** Unknown to Dr. Spiehs, the defendant Jones interrupted Dr. Spiehs saying this was his "warning" then called for a recess and muted Dr. Spiehs' microphone but the Board did not recess.

**63.** Dr. Spiehs microphone was unmuted which Dr. Spiehs told the Board the words he read from are from a book in the district's school libraries available to minors and asked if minors could read the words why he couldn't repeat those same words in discussing the Board's policy on library books.

**64.** Dr. Spiehs read from the same book repeating verbatim: "Fuck that cop, bruh. Fuck the police coming straight from the underground." The defendant Jones slammed her gavel down interrupting Dr. Spiehs saying she had "given him a warning" and that he was done speaking. Dr. Spiehs was disconnected from the Webex connection even though he had speaking time left and even though Dr. Spiehs could have been allowed to at least stay in the meeting to listen.

**65.** The following speaker Michael Eravi following Dr. Spiehs appeared in person and wore a shirt with the word "dumb-ass" printed on it and also displayed a message on a sheet of paper containing the phrase "fucked up" which were visible to the board.




**66.** When it came time for his speech during his 3 minute allotted time he stated:

**Eravi**: What you just did there, Miss Jones, was create a comparator. Thank you for that. I thought about reading from a book that is in the district library, and available for kids in the district to read. There are several words in the district libraries, that contain words like shit, piss, fuck and ass…
(**Jones** interrupting): Mike…
**Eravi**: …there are also a few books in our school libraries
(**Jones** interrupting): Michael this is your warning
**Eravi**: … that describe in graphic detail…
(**Jones** interrupting): I know you've…
**Eravi**: …the act of procreation
(**Jones** interrupting): …received this both virtually and
**Eravi**: …you know, most teens they call it having sex
(**Jones** interrupting): …that's it, Michael
**Eravi**: …or fucking…
**Jones**: OK! That's it!
**Eravi**: …then I thought about the inherent rights we have as United States Citizens to speak freely, and without inhibition. I'm convinced, the only was to drive this point home with assclowns…
         (unknown to Mr. Eravi at this point Mr. Eravi his microphone is muted even
                 though Mr. Eravi had speaking time remaining)
**Eravi**: …on a dais, is to simply speak fucking freely and without the bullshit inhibitions a few fools will try to force on people. Your policy is repugnant to the United States Constitution. The fact that you bitches would need to rethink your decision to put that policy in place.
         (**Jones** gavels out the meeting and board members begin leaving the dais)
**Eravi**: Aside from a repugnant policy, I have little reason to appear before you. I've never had children in this district, but you've gotten my fucking money every year regardless. My challenge to you is this, if you don't like the fucking words, we're

constitutionally able to vocally express in this room, either a, stop doing stupid shit, or b, don't enact policies that are clearly intended to limit the right to speak

(**Eravi** to board staff): I think you can stop the timer because they're in a recess. That's, this is hilarious the way you guys are running this

**Eravi**: There is no need for such a policy. Feelings? Fuck your feelings, Kelly. We have rights that trump your feelings, period. Beyond our simple right of expression, an institution of learning cannot properly prepare our children for real life with this unrealistic "you hurt my feelings" bullshit. I'm referring to the idea that your feelings are a priority. Damage to your feelings is not codified in law as a prosecutable crime. Some of you need to grow a pair. And Miss Jones, you need to quit acting like you have a pair, because you don't. Thank you for your time

**Eravi** (Walking away from podium area): We just proved a point in here ladies and gentlemen.

(**Jones** requests the rest of the board come back out but begins addressing issues alone)

**Eravi**: You don't have a quorum. Point of order, there's no quorum. Point of order madam chairman, there's no quorum

**Jones**: You cannot disrupt the business of this board

**Eravi**: I'm not disrupting the business of the board ma'am, there's no quorum. Ma'am, there is no meeting, you have no quorum. (turning to police) Would you tell her to stop? If you don't have a quorum, you don't have a meeting. Please understand your rules first. My god woman! You have rules too

**67.** Mr. Eravi was not required to leave the meeting or the building.

**68.** The next speaker was Ms. Schmidt who connected via Webex who read words verbatim from a USD 497 library book, which included the words "cock" and "balls" referring to genitalia. Ms. Schmidt stated:

Good evening, my name is Carrie Schmidt and I would like to share a concern of mine regarding the sexual content you are providing in your libraries for adolescents to read. This district is providing books that describe how to eat someone out, have sex, masturbate, and give a guy head. Just so everyone understands what I am talking about I am going to read a bit of the book called A Court of Silver Flames that is available at both your High Schools.

He couldn't take it. It was torture, a special kind of torture, to have Nesta kneeling before him with his cock in her mouth and hand and not be able to roar with pleasure. But then she stared at him through her lashes, and the sight of her with his cock between her lips snapped something. Cassian slid his other hand into her hair, and he thrust up into her mouth. She took him deep, and moaned so loudly it reverberated along his cock and straight into his balls

**69.** Defendant Jones interrupted Ms. Schmidt during her allotted 3 minutes of time by hitting her gavel while Ms. Schmidt read further from the book saying "They tightened further.." in which Jones talked over Ms. Schmidt saying "I'm gonna ask. This is. I'm just going to ask if you can make your point."

**70.** Ms. Schmidt attempted to ignore the interruption and quoted the book "in his spine, a scorching knot."  Jones said something to the effect of she might be asking Ms. Schmidt to stop to which Ms. Schmidt asked Jones "are you ordering or are you asking me to stop?"  Jones replied "thank you" as though Ms. Schmidt was finished and Ms. Schmidt asked again "are you ordering or are you asking me to stop?" Jones replied "no I am not asking you to stop. I want you to have your full time. I think you have a point to make and I do want to hear it." Ms. Schmidt continued to quote from the book "'She took him deep, and moaned so loudly it reverberated along his cock and straight into his balls. They tightened further, and release gathered in his spine, a scorching knot that had him."

**71.** Jones then interrupted Ms. Schmidt again by hitting her gavel while Ms. Schmidt said "aching into her mouth again. He was utterly at her mercy" and Jones said "OKAY."

**72.** The following dialogue then took place:

**Schmidt**: Nesta moaned once more, a soft encouragement, and-
(**Jones** interrupted and talked over Schmidt): can, Carrie can you please.
**Schmidt**: Cassian needed nothing else. Gripping her hair, her scalp, holding her in place, he thrust his hips...
(**Shannon Kimball** interrupting): Madam President
**Jones**: Yes
**Schmidt**: ...she met him with each stroke...
**Kimball**: Um, call a point of order. If the..
**Schmidt**: ...I will, I will

**Kimball**: If the…

**Schmidt**: Okay, here's the deal. I am…

(**Kimball** interrupting): I'm sorry ma'am. We're gonna pause your time for just a second.

**Jones**: Pause it.

**Kimball**: If she has a complaint, we have a complaint policy related to library materials.

**Jones**: Thank you

**Kimball**: And I would just remind the board that we have that complaint policy and um we can provide the citation to the policy for her to follow. Thank you.

**Jones**: Uh, we, do we have, we have the um comment and email that we can provide the, okay. So, pertaining to the complaint about the materials we can provide you um the information for contacting the board and um having that reviewed by a librarian. Okay can we um Carrie can you…

**Schmidt**: What's wrong with me reading this here?

**Jones**: I'm sorry Carrie, do you have a, if you want to make a complaint about…

**Schmidt**: I, I have…

(**Jones** interrupting): item, items pertaining to…

**Schmidt**: …a point I'm making and I feel like you're not allowing me to make that point.

**Jones**: I am explaining that if you have a complaint about a particular book we have a policy, a complaint policy pertaining to that uh which we can send you.

**Schmidt**: "And, and I have full rights to read the content to you….

(**Ronald Gordon Ross**: no)

(**Jones** interrupting): You do not.

**Schmidt**: …during public comment, because I don't think that you understand…

**Jones** (talking over Carrie): No we actually have the right to

**Schmidt**: …and know what's in this book.

**Jones**: Okay, so the time has run out. We appreciate um….

**Schmidt**: No I don't think…

**73.** At the point where Ms. Schmidt was saying "I don't think" the Webex audio connection was cut off muting Ms. Schmidt's voice without Ms. Schmidt's knowledge on Webex. She was not being heard but still seen. Ms. Schmidt continued to move her hands while speaking yet was muted unbeknownst to Ms. Schmidt. While Ms. Schmidt was still talking thinking she was still connected, defendant Jones stated "the comments that you've made and we will provide you the information pertaining to books and you are welcome to email us anything additional you have to say. uh

and we will make sure that you can um have access to that policy pertaining to books."
Ms. Schmidt was disconnected from Webex at this time.

**74.** Defendant Ronald Gordon Ross said "I.F." and Jones said "it is I.F." The "I.F."
they referred to is the USD497 Textbooks, Instructional Materials, and media
Centers policy. That policy requires parents of a currently enrolled USD497 student
to do the following:

> any student, or parent or legal guardian of a student currently enrolled in the
> district, having a complaint about textbooks, media center, or other instructional
> materials (referred to in this policy as the "requestor") shall meet with the teacher,
> media specialist, or principal.  If the concern is addressed to a teacher or media
> specialist, the staff member shall report the matter to the principal.  If the matter
> cannot be resolved, the principal shall notify the superintendent or the
> superintendent's designee and ask the requestor to complete a request for review
> form that is available through building principals or at the district office.  After
> receiving the completed request for review form, the superintendent or the
> superintendent's designee shall review and consider the request

**75.** It was and is unknown to Ms. Schmidt, Mr. Eravi, Dr. Spiehs, or any other reader
of that policy what "complaint" means other than having something negative to say
about USD497 curriculum and library materials.  The IF policy does not purport to
require parents to engage in the procedure or conduct of that policy if they have
something positive to say about USD497 curriculum or library materials.

**76.** Jones, with the approval of Kimball and her other board members, engaged in
viewpoint discrimination, improperly applied the IF policy to Ms. Schmidt as a
pretext to viewpoint discrimination, and did not provide Ms. Schmidt with 3
uninterrupted minutes of her speaking time, repeatedly interrupted Ms. Schmidt to
argue and express disapproval of Ms. Schmidt's topic and quotations from school
curriculum and library materials.  Ms. Schmidt was criticizing the reading material

but this topic is relevant to the board's oversight of school curriculum and library materials.

## FEBRUARY 10, 2025 MEETING

**77.** On February 9, 2025, at 8:17 p.m., Ms. Schmidt emailed USD497 requesting to appear at the public meeting via Webex as she did at the January 27, 2025 meeting.

**78.** In the response, USD497 added a new condition to participating by Webex – a "legal justification." USD 497 wrote "In addition, patrons must participate in person unless there is legal justification making it necessary to speak virtually." Ms. Schmidt stated "I need to speak online due to tonight's weather forecast." USD497 rejected Ms. Schmidt's request stating "making virtual comments is not an option. You may appear in person or email comments to the Board of Education."

**79.** Ms. Schmidt again emailed patroncomentary@usd497.org and stated "If you are allowing Justin to Webex into the meeting tonight, then why are you not allowing others to do that as well? Why does he get that privilege, but I do not get that same benefit? Why did he get the link, but I did not? I would like to use the same link tonight that was sent to me last time I spoke online two weeks ago." USD497 refused to provide the same Webex access provided to Dr. Spiehs.

**80.** The benefit to Ms. Schmidt of appearing via Webex due to inclement weather was denied by USD497.

**81.** On February 10, 2025, Dr. Spiehs connected to the Board meeting via Webex and spoke doing his permitted time. Dr. Spiehs asked if board member Anne Costello had violated the school district's harassment and non-discrimination policies when she

interrupted the meeting to call Dr. Spiehs "Crazy Justin Spiehs" during the previous board meeting.

**82.** Dr. Spiehs asked if it would be considered insulting if Dr. Spiehs had called her "Bitchy Anne Costello" – to which the presiding board member Jones interrupted Dr. Spiehs saying "I'm pausing your time. If you continue using foul language you will be stopped from participating because it's disruptive."

**83.** Judge Robinson ruled in *Spiehs v. Armbrister,* No. 24-4005-JAR-BGS, 2025 WL 548423 (D. Kan. Feb. 19, 2025) that it was unclear how a meeting could be disrupted during the allotted 3 minutes of speaking time ("Given that members of the public are entitled to three uninterrupted minutes during the public-comment period, it is not clear—based on the allegations—that such speech causes disruption or disorder when the Commission has already set aside dedicated time for the individual speakers").

**84.** Dr. Spiehs then said, "I came in here a couple weeks ago and I talked about how your guys' policy is bullshit" to which Jones interrupted him again and removed him from the meeting prior to the end of his allotted speaking time.

**85.** The podium for in person speakers was placed under TVs hanging from the ceiling which was not safe.

**86.** The dialogue is as follows:

**Dr. Justin Spiehs**: All right, my name is Dr. Justin Spiehs. At the last school board meeting one of your school board members, one of your school board members Anne Costello uh right before I started speaking during general public comment, called me crazy Justin Spiehs. Your guys' policy here at the meeting say please be respectful of the presenters the board and your fellow audience members as we discuss and deliberate the items on tonight's agenda. Comments or actions that are threatening or disrespectful of presenters the board or others in attendance, including use of foul language or any other behavior that disruptive, that is

disruptive of the board meeting will result in immediate removal from the meeting. So would you guys consider that disrespectful have one of your board members call uh call me crazy? If so why wasn't she immediately removed from the meeting? Why do your guys' rules uh supposedly apply to us, but they don't apply to you guys. Furthermore, you guys have a non-discrimination statement that says Lawrence Public Schools USD 497 is committed to maintaining a learning environment free from discrimination, insult, intimidation, or harassment for any reason. Would you guys say that her calling me crazy Justin Spiehs was an insult? If it is what kind of example are you guys setting to your students? You guys' precious policies there that say we can't be a certain way, but you guys freely can. You have no consequences whatsoever for doing it. I emailed all of you asking what kind of disciplinary action be taken against her for uh for saying that about me and got no response about it at all whatsoever. So do you guys think it's insulting and disrespectful to do that if I were to call her crazy Anne Costello? Would that be insulting? What about stupid Anne Costello or ugly Anne Costello? What about bitchy Anne Costello?

(**Jones** interrupting): Justin This is your warning

**Spiehs**: …what about bitchy Kelly Jones?

(**Jones** interrupting): Your warning. Uh, it's your warning

**Spiehs**: …any problems with that?

(**Jones** interrupting): Can you pause the. Justin you're, I'm pausing your time. If you continue with any foul language you will be stopped from participating because it's disruptive. It doesn't comply with the policy. Can we start the time back please?

**Spiehs**: And so now I'm able to also use foul language now? Is that uh is that what's going on here? Why, why is that allowed now? I mean I, I came in here a couple weeks ago and I talked about how your guys' policy is bull shit and this, this-

(**Jones** interrupting): Okay you can disconnect. You can turn off the…

**Spiehs**: … perfectly demonstrates how much bullshit it is

**Jones**: Got it? Okay thank you. Okay we're going to move on to the next speaker. Um Michael you can come to the board. Just to be clear make sure you stay at the podium.

**Eravi**: You got a safety hazard there that I'm not going to comply with. I'm not standing

**Jones**: If you come up to this board

**Eravi**: I'm not standing underneath that thing. Cuz if it falls it's…

**Jones**: If you move from that spot I'm going to ask for you to be leave. To have to be removed

**Eravi**: Shut up

**Jones**: That's where we're at

**Eravi**: Crazy Anne Costello why don't you chime in here? Don't start giving me directives lady. The only reason you're acting that way is cuz of who I am. The way you're acting is bullshit.

**Jones**: So that's your warning.

**Eravi**: You, you just threw somebody out…

(**Jones**: interrupting) That's your warning

**Eravi**: …because they used a curse word. You guys need to grow some, grow some thicker skin, because if curse words hurt your feelings that's pathetic cuz in your, in your library you've got books that describe in graphic detail the act of procreation. Did you know that? Shake your head yes I knew that. Right Kelly, right Kelly Jones your hatred for me just bleeds through, because if I can't move from right here. What if I stood right here? Is that a problem for you? What if I stood over here, is this a problem?

**Jones**: Michael that is where we're doing public comment at…

**Eravi**: How about if I came right here….

**Jones**: Okay so at this point you're being disruptive

**Eravi**: How am I being disruptive? I'm during, I'm during…

**Jones**: Because you need to stay where I have a, can you pause the time?

**Eravi**: "You keep interrupting me."

**Jones**: "I am being clearly, I have paused the time. Where you can speak is at the podium. If you move from the podium you will be sitting. "

**Eravi**: I'm not standing underneath that thing

**Jones**: Are we clear?

**Eravi**: No Kelly we're not clear, because you're being real bitchy toward me.

**Jones**: Okay that's it, you need to sit down

**Eravi**: No I'm not going to sit down.

**Jones**: If you don't need, if you need help sitting down.

**Eravi**: Start that timer back up because I have 3 minutes and you're not going to have anybody help me sit down

**Jones**: Oh yes I will

**Eravi**: Start that timer back up. I have 3 minutes

**Jones** (to the police officers in the room): Can I, can you please assist him in sitting down please?

**Eravi**: Start the timer back up I have 3 minutes. Start the timer back up I have 3 minutes. Start the timer back up please I have 3 minutes. You stopped the time at 2:07….

(**Jones** talking over Eravi): Are you going to, are you going to comply with the policy?

**Eravi**: ….Please start the timer back up. You stopped at 2:07. I have 3 minutes. Start that timer back up please. Start that timer back up. I have 3 minutes

(**Jones** talking over Eravi): Michael you have to comply with the policy and you did not.

**Eravi**: …you have to comply with the US Constitution. Start that timer back up. I have 3 minutes. Start that timer back up.

**Jones**: You are being disruptive in the meeting. You need to sit down.

**Eravi**: Start that timer back up. The charge is 215922 if you think you can stick it go at it. You got…

**Jones**: You need to sit down

**Eravi**: You stopped the time. I need the timer to start, so I can finish my 3 minutes.

**Jones**: Are you going to finish it within the Policy?

**Eravi**: I need the timer to start, so I can finish my 3 minutes

**Jones**: Can you go to the podium?

**Eravi**: I need the timer to start, so I can finish my 3 minutes

**Jones**: Oh my God

**Eravi**: It's that easy. Start the timer so I can finish my 3 minutes please. It's that easy. Start the timer, so I can finish my 3 minutes. Start the timer please. Start the timer. When the timer starts. Start the timer Kelly. We're at a standstill here. Your timer is at 2:07. Start the timer so I can finish

**Jones**: Can you sit down please?

**Eravi**: Start the timer so I can finish my 3 minutes. You've interrupted my 3 minutes and stopped me at 2:07. Please let me finish my 3 minutes

**Jones**: Can you sit down please?

**Eravi**: Let me finish my 3 minutes. Start the timer back up and let me finish my 3 minutes. You're violating the law right now. Start the timer back up and let me finish my 3 minutes

**Jones**: Please sit down

**Eravi**: Kelly, you're violating the law right now. Start the timer back up

(Jones talking over Eravi): Then take it up with your legal counsel. You need to sit down

**Eravi**: Please, let me finish my three minutes

**Jones** (to police in the room): Can we get help please? Removing him from the, the building or sitting down? Just sitting down is fine

**Jones**: (to Eravi): You may stay and you can, we want to hear what you have to say and you can come back

**Eravi**: I want my 3 minutes. Start the timer…

**Jones**: Are you going to comply with the policy if I turn this back on?

**Eravi**: So I can finish my 3 minutes. There's no questions to answer. Start my timer back up so I can finish my 3 minutes. Start my timer back up

(**Jones**: *Big Sigh*)

**Eravi**: They're not going to arrest me because they know I've not broken a law. Start the timer back up

**Jones**: You are disrupting this meeting

**Eravi**: No I'm not Kelly. You disrupted it by stopping my time…

(**Jones** talking over Eravi): I stopped it so that you could have your full 3 minutes. If you comply with the policy

**Eravi**: … tart my timer back up your policies are unconstitutional. Start my timer back up, so I can finish my three minutes

**Shannon Kimball**: Madam president, could I call, could I ask if you would like to call for a recess?

**Eravi**: I will expect my 2 minutes and 0 7 seconds back when you get back. I'm not leaving until I get my full 3 minutes Kelly Jones. And they're not going to arrest me because I haven't broken a law. You gave me 3 minutes and you took it away.

**Jones**: I'm not asking anybody to arrest you I'm asking you to sit down

**Eravi**: They're not going to do anything to me because I haven't broken a law Kelly. You need to start my timer back up and let me finish my three minutes. That's your only choice here. That's your only choice. I'm sorry that you don't like it, but that's your only choice. Start the timer back up, please. You're making this harder than it needs to be. Start that timer back up guys please

**Jones**: You know what…?

**Eravi**: 2 minutes and 7 seconds and I'd be done. 2 minutes and 7 seconds. Start my timer please. We've already taken way too much time Kelly start my time back. Please. (Long pause) Start my timer please

**Jones**: Go ahead, start the timer

**Eravi**: My challenge to you is this, if you don't like the fucking words…

(**Jones** interrupting): Okay that's it. You got to go

**Eravi**: *inaudible*

**Jones**: Stop. We're going to call recess now please

**Eravi**: Start my timer back up…

**Jones**: You need to be sitting down when you come back. Your time is done

**Eravi**: My time is not done. I will have 2 minutes and 2 seconds when you come back

(Board went into recess for approximately 2 minutes. Michael Eravi is still standing waiting to speak).

(Board resumes with meeting)

**Jones**: And the time for public comment has ended

**Eravi**: I have two minutes and 2 seconds left *inaudible*…

(**Jones** interrupting): We're moving on now

**Eravi**: …speak

**Jones**: Do we have another speaker?

**Eravi**: Point of order. Point of order. You can't do this, you can't Constitutionally do this. You can't just shut us down like this

**Jones**: In person?

**Defendant Swift**: I think so

**Eravi**: You can't do this

**Jones**: Oh okay. Okay. Is Carrie Schmidt here? In person?

**Eravi**: I have 2 minutes and 2 seconds left. Can't kick me out. Public comment is not over and I have 2 minutes and 2 seconds left. You tried everything Kelly. Just give me the 2 minutes and 2 seconds and we're done. You tried every illegal move here Kelly. Give me 2 minutes and 2 seconds back on the clock and lets finish.

**Jones**: Okay we're moving, uh. I need a consultation about whether or not I can remove public comment. I'm going to cause a, call a recess to make sure that I'm…

**Eravi**: Call your attorney, you're gonna get sued over this one. I want my 2 minutes and 2 seconds back

**Kimball**: Madam president would you like to call an additional recess?

**Jones**: Yeah we have to call an additional recess

**Kimball**: Okay

(as board members walk out)

**Eravi**: Just give me 2 minutes and 2 seconds guys this is absolutely childish and pathetic. Go join em crazy Anne Costello. Go join em.

(Board went into recess for around 6 minutes.  Mr. Eravi speaks while board members absent)

**Eravi**: This is stupid. This is dumb. Look at the example you are setting for the students here. Trying to shut one person down, you're going to go through this amount of crap. Pathetic. Pathetic, every one of you. You should be ashamed of yourselves and this board, the way they're acting tonight.

(turning to police) and I do appreciate you two understanding the law finally, and not moving to just arrest people because they say so.

(turning back to the board) Maybe you guys should take a lead from LPD, they're figuring it out. Maybe you guys could too. If they thought you could do this, they would have already been up here doing it. Think about that. Then make a motion to just have your chair give me my 2 minutes and 2 seconds. And as a result of the way this meeting has gone, I'll be back again in a couple weeks. Until you guys can get it right, I'm going to be here every time. 2 minutes and 2 seconds. That's all you need to do. 2 minutes and 2 seconds. (Long Pause) You think you guys can tell people where they can stand, where they're allowed to talk? And the nastiness! There's no need for it. Before I even had a chance to speak. 2 minutes and 2 seconds, it's worth it, that much. To me it is.

**Eravi**: (Holding up his paper): How come I don't get thrown out for this? Guys, Really? How come she doesn't try to shut me down for this, I've been holding this all night long. Why is that? (turning to journalists) Newspaper? Why is that? I've been holding this all night long, but she hasn't tried to throw me out. The written word is ok but the vocal word isn't. It's called a constitutional comparator people, and it's a problem.

**Eravi**: Man! Do you know how bad she's caught trying to end public comment like that? Whew, Dam, That's gotta sting. Two minutes and two seconds. That's all I want.

**Eravi**: Spending all this time trying to figure out how to make me go away, and the only way you're gonna do it is by giving me my 2 minutes and 2 seconds. That's the only legal way it's gonna happen. Look at the amount of time you're taking trying to figure out how to make one guy go away. Does that make any sense to you guys? (Turning to staff) Staff? Does this make any sense to you guys at all? The amount of time you're putting toward making one guy go away?

**Eravi**: At the point you guys can get them to threaten my arrest, I'll leave. If you can get them to threaten my arrest, I'll leave. If you can get one of those officers back there to tell me if I don't leave, I will be arrested, that's the point that I will leave. Otherwise, I'm getting my 2 minutes and 2 seconds. So if you can get one of them to put themselves on the line instead of you, that's your only way out. Cause that's what they'd be doing, is putting themselves on the line for you, because you guys screwed this up and they both know it.

(Board members re-enter the room)

**Eravi**: 2 minutes and 2 seconds Ms. Jones. Putt 'em back up and let's get this over with. It's the only legal way you're getting out of this.

32

**Jones**: I apologize for taking so much time

**Unknown Male Voice**: Want to be there

**Jones**: I believe we have

**Kimball**: Yes, Madam President given that uh we have other agenda items to attend to this evening uh that we need to get our business done I make a motion that we amend our agenda and we move the public comment item to the end of our agenda for this evening and uh continue our public comment…

**Eravi**: Unacceptable

**Kimball**: um after we have completed item

**Eravi**: Point of order you can't move it, it's already….

(**Jones** talking over Eravi): You cannot make a point of order

**Eravi**: You've already started public comment

**Jones** (to another board member): Go

**Eravi**: You can't stop public comment in the middle of it guys

**Kimball**: I can

**Eravi**: I have 2 minutes 2 seconds

**Jones**: So we have a motion

**Board Clerk**: The motion passes 7-0

**Jones**: Okay

**Yolanda Franklin**: I didn't say yes. I was going to say no

**Eravi**: Ms. Franklin. Thank you for supporting the constitution

**Board Clerk**: Oh, I'm sorry. The motion passes 6-0

**Kimball**: No, 6-1

**Eravi**: The rest of you are going to get named in a lawsuit for this

**Jones**: Kay

**Eravi**: You cannot shut down public comment at 2 minutes and 2 seconds remaining…

(**Jones** talking over Eravi): Okay we are going to move on to board commentary. You need to sit down

(**Eravi** to Sgt. Eric Barkley): Is this what you guys are going to allow? Is this what you guys are going *inaudible*?

**Jones**: Wait, this is disrupting the meeting

(**Jones** to Barkley): Can we please get assistance so that we can continue with the business of the board?

(**Eravi** to Barkley): Am I disrupting the meeting or did they disrupt public comment? It's for you to decide.  Cus they're  asking you to threaten my arrest at this point now. They have violated the law

**Barkley**: The only, the only way you'd be removed, for him to be removed, at this point, is if Dr. Swift would ask you like criminally trespass you from the building

(Eravi to Barkley): And how do I get criminally trespassed when I've broken no law sir?

**Barkley**: I'm just saying that, that's the only way like at this point

(**Eravi** to Barkley): And how's that going to happen if I've broken no law?

(**Jones** to Barkley): So if we, if he, if we continue to, just, if he stands up here and continues to make, I just want to be really clear…

**Eravi**: 2 minutes and 2 seconds

**Jones**: … that if he stands up here and continues to just disrupt and we cannot continue with the business of the board he may continue to do so, is that correct?

**Eravi**: How can I be disruptive during my time to speak?

**Barkley**: I guess my point is you you've been given an opportunity to speak for 2 minutes and 9 seconds by whatever making rude comments he's not breaking any law

**Kimball**: But he is breaking our decorum rules and the chair has the authority within the board meeting to enforce decorum rules and she is trying to do so and…

**Eravi**: …not discriminatorily

**Kimball**: … we are trying to figure out a solution to this where we can continue our board meeting while also respecting people's rights to have public participation

**Eravi**: two minutes

**Kimball**: He has now taken up an extreme amount of time in this board meeting fighting with the chair

**Eravi**: Her, no

**Kimball**: over our decorum rules, which she is allowed to enforce. So we, we really have a problem here and I am asking…

**Eravi**: point of order. You can't reframe this. You can't reframe this

(**Kimball** raising voice): "I have the floor as a board member. You can sit down and be quiet so that we can…

**Eravi**: You can't reframe this that I have interrupted during my time guys

(**Kimball** raising voice): Because you are not following the decorum rules.

**Eravi**: Guys, I have two minutes and two seconds

**Kimball**: We have them and we are allowed to enforce them

**Eravi**: You can't just arbitrarily shut it down and shut me down that way. It's illegal. I'm gonna sue you

(**Kimball** in raised voice): You, you are permitted to speak if you follow the decorum rules and you have repeatedly decline to do that

**Eravi**: I want my 2 minutes and 2 seconds back up on the screen. two minutes and two seconds

**Jones**: Without any assistance I would like to. I'm going to have a conversation with the board colleagues, and you can listen Michael okay just for a moment. We do not have assistance from law enforcement. Michael is not going to sit down. I do want the board meeting to move on. I think Yolanda likely would to based on vote. Um so I'd like the board to reconsider the, uh motion to move to the end, the comment to the end of the meeting, um and we will need to consider uh utilizing public comment in future meetings, which likely, unlikely at this point. Um, so I'm asking, I we have no assistance to uh get him to sit down or to otherwise move so I'm asking the board to reconsider the motion that was on the table just to get this to move along

**Gordan Ross**: I'm fine with letting him speak

**Bob Byers**: If, if, uh his, okay. If we move it to the end of the meeting, he, he has his 2 an, 2 and a half minutes or, to speak

**Jones**: We have no assistance in enforcing our policy. We have, we have been informed that we have no assistance enforcing the policy and that he will not be sitting down. He's informed us that he's going to continue…

**Byers**: So?

**Jones**: …to remain in the building. So if he will sit down after 2 minutes that might be the best thing that we can…

**Byers**: I'm in, I'm inclined as GR is just let him speak. Let him speak

**Costello**: Do you need a motion?

**Jones**: Yes

**Byers**: We would need a motion

**Costello**: I move to reopen public comment um and move it back from the end of the meeting to current. I don't know if there's anything else

**Kimball**: Or just say move it to its current

**Costello**: Move it to its current place in the agenda

**Gordan Ross**: Second

[motion passes 6-1 with Kimball voting no]

(**Jones** to Eravi): I'm gonna give you back your time on the on the clock. I do not have to listen to you. I'm going to get up and leave, and then when you are done I'm going to come back out

(Jones walks out)

**Eravi**: Start my time that's a whiny bitch move right there

(Kimball walks out)

**Eravi**: Now you guys all learned this fucking lesson. Stop shutting people down. Give them their goddamn three minutes and shut your fucking mouths. They're allowed to come in here and talk. Trying to put somebody underneath a hazard like this is stupid. This podium should be either up here or off to the side or in the back. Trying to make somebody stand underneath that is a risk and I'm not going to take it for you dumb asses and the fact that she verbally came at me before I had even a chance to speak laid your intent there. And that one, Kimball who voted no. How insane is that? You guys just got taught a lesson. And do you hear how I don't need to cuss now because you got taught the lesson? You got taught to shut up and just let the people speak. Next time Justin Spiehs is on your damn Webex just let him speak. When she comes up here to talk just let her fucking speak. How hard is that? Really. Gordon why do you hate me so much? Is it because I asked you about the policy and you kind of threw the board under the bus? I want to see that policy that said we can't speak online anymore, because I assure you, you're going to long for the days that you could have relegated me to the online room. You can have your thirty seconds back

(**Eravi** to Police Officers): I appreciate you guys following the law. Thank you.

**Jones**: Okay the last public comment is Carrie Schmidt

**Schmidt**: Is it safe to stand under here? Now I'm worried. Cus…

**Jones**: *inaudible* go ahead.

35

**Schmidt**: It's kind of like your liability. Okay. Wowza, can y'all hear me?

**Jones**: Can you restart it? She was getting settled

**Schmidt** (moving the podium back so it's not under the TVs): I'm just…

(**Jones** interrupting): "to three *inaudible* clock

(**Schmidt** moving the podium back.): trying to…

**Jones**: No it's okay. We want to get you back to the three minutes here

(**Schmidt** moving the microphone to be by the podium.): *inaudible* out what's going on here

**Jones**: Okay, as soon as you're settled we'll start the clock. Welcome

**Schmidt**: I don't know if I'll ever be settled

**Female Board member**: Yeah me neither

**Male Voice**: "*inaudible*"

**Schmidt**: Can we scoot this back?

**Jones**: Just if you could…

(Schmidt moves podium further away from beneath TVs): I'll be further away from you. That okay?

**Jones**: Not really but, just…

**Schmidt**: Okay, um, with all due respect I have to say that I'm appalled with how you all are treating certain people who speak at these meetings. Just because they aren't praising you doesn't mean that you get to decide what words they are allowed to say in here, interrupt them or turn off their mics, so no one can hear what they have to say. You caused this by the insane policy you set. You told me last meeting that I would get my time back after you rudely interrupted me while I was reading a book available to your high schoolers in the district, then you spoke during my time, told me that I did not have the right to speak and then my time was magically over. I'm speaking to show you how wrong you eh, how wrong you are and hypocritical your policy is, because although you preach decorum here you provide porn and vulgarity to the students in this district. With that I'm going to share with you just some book titles in the district that I think that you should know about. Um, here we go. Here Lies a Vengeful Bitch in a high school. Cock-A-Doodle Dudley elementary schools. You stopped me last time for saying that word. Yaki Delgado Wants to Kick your Ass, middle and high schools. Wonderful Pussy Willows in an elementary school. Lady, My Life as a Bitch in a high school. The Transformations of Lucious, Otherwise Known as a Golden Ass in a high school. Words Will Break Cement: The Passion of Pussy Riot in a high school. My Hero Academia Volume 2 Rage You Damned Nerd in Middle Schools. Moby Dick or The Whale middle and high schools. You'll Love Cock-a-Poos in an elementary school and The Owl and the Pussycat in an elementary school. Uh, this one is good the title is Did Nobody Give a Shit What Happened to Carlata

I picked up the book and opened it to a random page and it said this That's why men who don't be fucking men be fucking the fuck out of men, up in their right, because human contact just human contact at the end of the day, something warm with the hole right there and you'll reach out and touch it. Cuz you know that's quality right here. It is interesting to me that you allow any and all words to be

36

read by adolescents, but you pick and choose what words adults are able to say in these meetings and call me crazy, but that seems to go against our rights as damn Americans. Maybe you'll be okay with the book that's in elementary, this book that's in elementary and middle school is called The Body Book for Boys. Um, let's see what it has to say

You come across an ad in a magazine or on the web for some magical product that will make your penis bigger. It might be a cream, a pill or even something called a penis pump. Don't be fooled there's no way to change the size of your penis. Why is your District teaching Elementary and Middle School age students about sex toys? Shame on you.

**Jones**: Okay your time's up.

**Kimball**: "Madame President I did want to give an explanation of vote, for my vote earlier so I'll use my public comment time for that purpose. I was in a Committee hearing today, in the Kansas State House or I observed a Committee hearing today in the Kansas State House. and you can check the video on this, where a person giving testimony, didn't even use curse words they actually just said some unkind things. and the chair called for the person to end their time and sit down early. and no one questions decorum rules when they are enforced, in the State House and, and in other places and for some reason in this community, we seem to have, lost the ability to enforce reasonable decorum rules in a public meetings to protect the integrity of the people who serve, the people who work in these spaces, and the people who observe these meetings, including our teachers and our students and our parents and I think that there needs to be some really deep soul searching um, as to why that kind of behavior is okay in these spaces, but not in other spaces and that is why I voted no, because I think that um you know bullies are going to continue to bully when they're permitted to be bullies and we are attempting to um enforce our anti-bullying policies our anti-hazing policies, our complaint policies. That's why we have all of these rules and we absolutely must be permitted to enforce them…

\*\*\*

**Jones**: "mm, hm. I appreciate the insight. I really appreciate both you and Shannon's comments pertaining to that. I do um there is one other opportunity for us to consider or well for me to consider and that is that um it might be that public comment has become too disruptive and we might need to unfortunately um open up uh contact with the board through um email and um individual meetings as needed um in order to get control back of the meeting. So it is pretty heartbreaking to me to be considering that at this point, but um we do not have assistance from, um based on what was described to us during the meeting from, uh, that we're not able to get assistance in terms of just getting control of the meeting from, um, in the manner that I had anticipated, so we will need to consider that for the next um short bit of time unfortunately. Uh because it is disrupting um our work at this point. So

## FEBRUARY 24, 2025 MEETING

**87.** Prior to February 24, 2025, the Board decided (without voting at a quorum official meeting) to move public comments to the end of their open meetings.

**88.** On February 24, 2025, Ms. Schmidt read to the Board during her allotted speaking time from the same book Dr. Spiehs read from (The Hate You Give) including verbatim passages including "Fuck the police" in which Ms. Schmidt was not interrupted or removed from the meeting.

**89.** Immediately following Dr. Spiehs then spoke during his time via Webex stating Judge Robinson's ruling about not being a disruption during one's allotted speaking time and then concluded "so the disruption is coming from you assholes." Presiding board member Jones interrupted Dr. Spiehs and warned. Dr. Spiehs said "Fuck you and your warning" which the defendant Jones disconnected Dr. Spiehs from the meeting prior to the conclusion of his allotted speaking time.

**90.** Mr. Eravi appeared next by Webex. The dialogue was as follows:

**Eravi**: If you're going to say my name, say it correctly, please
**Jones**: Michael?
**Eravi**: Hello?
**Jones**: It's your turn
**Eravi**: So, I think it's time to remind you and everybody else watching and reporting, of the clear messages that's been sent to you every time, before I step foot in that room to speak. You all received several emails from me expressing disgust at your continued efforts to silence certain people with expressed viewpoints that you find hurtful to your ears. It is a constitutional right of the people to express those points of view in this public forum. In those emails, I told you weeks in advance that I would come to this meeting, using words you find objectionable, to express a viewpoint you obviously disagree with, and why… a constitutional right of the people. That's why. Because you'd shut down other people before me. In those same emails I referenced the first amendment protections that we have as citizens of this country. I also referenced Cohen v California, a supreme court case that specifically addressed cursed words and obscene language, and the

right of the people to use those words and phrases you find objectionable. Instead of recognize that, recognizing the clear legal implications of your actions, you chose an attempt to criminalize me. A viewer who commented on a recent video report I published about your behavior summed up the definitions and expectations better than I, you, or the urinal world ever could. Quoting Edmund Davis, "The decorum rules apply until the board opens the meeting up for public comment. When they open for public comment, they create a designated public forum, which is governed by the same rules that apply in traditional public forum. That is, strict scrutiny. This makes it an unconstitutional infringement on free speech and expression when the board censors, or punishes speakers based on the content of their speech. Which you have done. What this means for the dipshits on the dais …

**(Jones** interrupting**):** This is your warning

**Eravi**: …this means you are to sit there on your ass and keep your fucking mouth shut for three minutes

**Jones**: *inaudible*

**Eravi**: Now you're gonna cut me off?

**Jones**: Yes, I am

(unknown speaker): remove?

**Jones**: uh-huh

(Mr. Eravi disconnected from the meeting)

## MARCH 10, 2025 MEETING

**91.** On March 10, 2025, Ms. Schmidt spoke in person.

**92.** The president Kelly Jones had made a comment at a prior open meeting that Ms. Schmidt was not from Lawrence stating before she spoke "Carrie I think you're joining us, I don't have your information here, but you're joining us from outside of Lawrence correct? Outside of Douglas County?".  Then after Ms. Schmidt finished speaking Jones said "Thank you for coming up to Lawrence, appreciate you driving." In reference to that, Ms. Schmidt said "Hello, my name is Carrie and I am that bitch from some other fucking town."

**93.** Defendant Kelly then told Ms. Schmidt she had violated the public comment policy.

94. Ms. Schmidt said "I started coming to these meetings because of the hypocrisy in your shitty profanity policy."

95. Defendant Kelly said "okay that's it, you need to now leave the, if you are not going to be cooperating we will ask that you be removed from the building." Kelly then had Schmidt's microphone muted so it could not be broadcast or heard.

96. Vice President Ronald Gordon Ross said "do it." Kelly spoke with Lawrence City police who were present. The camera feed is moved from Ms. Schmidt by City staff.

97. Two Lawrence police officers Affalter and Bishop confront Ms. Schmidt while she was reading her comments during her allotted time indicating she must stop and leave.

98. The dialogue at the meeting included the following:

> **Jones**: Carrie is joining us from outside of Lawrence
> **Schmidt**: All right, good evening as you know my name is Carrie. I am that bitch from some other fucking town
> **Jones**: This is your warning
> **Schmidt**: I started coming to these meetings because of the hypocrisy in your shitty profanity policy...
> (**Jones** talking over Schmidt while her microphone is muted to online viewers): Okay that's it, you need to now leave if you are not going to be cooperating. We will ask that you be removed from the building
> **Schmidt**:... in the district, by the content you provide for them to read by your bogus profanity policy in your board meetings because you, who aren't minors, don't want to hear people say certain words. Not only that, but you are actively doing everything in your power to silence people for saying that your board policy is quote bullshit
> (**Jones** talking over Schmidt): Okay
> **Schmidt**: ...your policy...
> (**Jones** talking over Schmidt): So...
> **Schmidt**: ...does not trump the fucking constitution...
> (**Jones** talking over Schmidt): If you continue to go on in this manner, we will have to have to ask you to leave.
> **Gordan Ross**: Do it
> **Schmidt**: ...actually...

(**Jones** talking over Schmidt: Okay, we are ready, we're requesting
(The USD497 camera is repositioned not to show Ms. Schmidt at the podium – is instead zoomed in on the board members.  Police officers walk up to Ms. Schmidt and stand behind her)

**Schmidt**: …correct me if I am wrong though. In these meetings you have thrown actual temper tantrums…

**Swift**: guys

**Schmidt**: …to try to silence people. None of you are

**Unidentified Staff**: It's cut

**Swift**: Okay thank you

                    (Ms. Schmidt's microphone has been muted)

**Affalter**: They've asked you to leave, so you need to leave

**Schmidt**: But I'm just speaking

**Jones**: You're done

**Schmidt**: Okay

**Swift**: thank you

(**Affalter** speaks to Swift): Okay for how long? Do you have a duration?

(Swift walks to Jones where Jones says to Swift): 60 days

**Swift**: 90 60

(**Swift** to Affalter): 60

**Affalter**: Okay

**Swift**: Okay thank you sir

(**Jones** to Swift): Thank you

(**Swift** to Jones): 60 days

(**Jones** to Swift): Yes

**Ross**: Keep going. You can do it

**Jones**: Okay

(Schmidt is removed by officers and is taken into the lobby with Officer Bishop)

(**Affalter** to Bishop): 60 days trespassed

**Bishop**: 60 days

**Schmidt**: So I just want to get this so that I am understanding, okay cuz I know you guys probably have that on you

**Affalter**: Yeah, no I, I wholeheartedly welcome you to record just like I am.

**Schmidt**: Okay

**Affalter**: We're just following what they asked. They've asked that you be trespassed for 60 days

**Schmidt**: Okay, and it's because I spoke words that they…

(**Bishop** interrupting): They can choose to trespass anybody for any reason

**Schmidt**: Okay

**Affalter**: Do you have your ID and I can just, uh issue the trespass and just log it on our system?

**Schmidt**: Um, I mean

**Derek Doerfler**: They asked you to leave?

**Schmidt**: "Yeah, they're now wanting like my, my ID

41

**Doerfler**: No, you just have to leave

**Affalter**: Okay

**Bishop**: So for 60 days you can't come back to

**Doerfler**: Why, why do why do you guys keep doing this to people that

**Bishop**: It doesn't have anything to do us

**Doerfler**: Yah, you guys are the police, you aren't the

**Bishop**: Right

**Affalter**: Right, someone has the right to trespass someone, so once they've asked

**Doerfler**: Not from public property unless they commit a crime

**Affalter**: They do. They do

**Doerfler**: Not from public property unless there's a crime committed. She didn't disrupt the meeting. She spoke during public comment. That's how the law works

**Affalter**: But this is

**Doerfler**: this is this is public property

**Affalter**: Right, but this they're still running this meeting, so they have the right to do that during the meeting

**Doerfler**: Because their feelings are hurt?

**Affalter**: I can't make

**Bishop**: For whatever reason

**Doerfler**: Are you guys law enforcement or are you guys enforce feelings?

**Bishop**: For whatever reason that they choose

**Doerfler**: Okay, so you enforce feelings

**Affalter**: I'm enforcing that they wanted the criminal trespass issued. I'm not enforcing

**Doerfler**: You can't trespass someone if they aren't breaking the law on public property

**Affalter**: I can

**Doerfler**: You can't

**Affalter**: The superintendent

**Doerfler**: It doesn't matter

**Affalter**: Dr. Swift has

**Doerfler**: I'm just telling you, you can't. That's why I wished you guys didn't get yourself involved

**Affalter**: I'm

**Doerfler**: You just did

**Affalter**: I, I mean I don't enjoy it, but I still have to abide by it when someone asks

**Doerfler**: You don't have to

**Affalter**: I do

**Doerfler**: Did you see the meeting the last, the meeting where they didn't abide by it?

**Affalter**: I did. I was here for that

**Bishop**: Right

**Affalter**: They didn't say to leave

**Doerfler**: You just, so who changed, who told you to change your mind about that?

**Affalter**: It's what they said. They said have Mr. [ ] sit down and be quiet. I can't legally make someone sit down and be quiet. If they had said, can you have him leave the property we want him trespassed, then we can enforce that

**Bishop**: Right

**Schmidt**: So like if I wouldn't have left right there you would have arrested me?

**Bishop**: Correct

**Doerfler**: So, you get a warning, you get a trespass warning, we can leave now, but my question to you is, if in a public, on public property, which we're at right now

**Affalter**: Correct

**Doerfler**: just like it being a Post Officer or City Hall or [ ]I'm not trying to, if, if someone doesn't break the law, if we were at the Lawrence PD right now, or the sheriff's office

**Bishop**: You can be trespassed at a police department too

**Doerfler**: Yah but I have to, you have to break a law

**Bishop**: No

**Affalter**: No you don't

**Doerfler**: Yah you do.

**Affalter**: No you don't

**Doerfler**: Yes it is

**Bishop**: You can be trespassed from Target for any reason

**Doerfler**: Yah, but Target's a private

**Schmidt**: But that's a private

**Doerfler**: this is a public place. Have you guys not seen the millions and millions of YouTube videos put out there about people going into like public places.

**Affalter**: I and I am very well aware of this

**Doerfler**: I support the police. I'm not, I try to help

**Affalter**: I'm, just doing what I am asked by my supervision, for [ ] instances

**Doerfler**: So who makes this, so who is guiding you, is that the superintendent?

**Affalter**: No. No it's our sergeant through lieutenant [ ]

**Schmidt**: Who's that?

**Affalter**: Rich Lockhart is the chief of police

**Schmidt**: Okay

**Doerfler**: I just, I just really think, just

**Bishop**: I have to be back in there in case this happens again

**Schmidt**: I don't think there are any other public speakers

**Bishop**: There are 3 more

**Doerfler**: There's a difference between public property and private property

**Affalter**: I understand

**Affalter**: I understand that and that's why you guys have, and if you want to go back and we can walk out

**Doerfler**: Yes, you can do that, yah we can walk out

**Affalter**: If that's fine with you guys

**Doerfler**: Yah

**Affalter**: So that's why you guys get to do the civil side of things too. To make sure we're held accountable for what we're doing. I'm just

**Schmidt**: But, but who wants to do that? Like, you know what I mean? Like that's not fun for anybody

**Affalter**: I know it's not but it's, this is where we are right now and kinda what we have to do right now. If you guys have questions about it, you can contact the office of the chief, for us and make sure if you have a complaint against me. I'm

**Doerfler**: I know but they said there's no complaint against you. So, I have a large issue with what she just said. She just said that, the other officer, that you can get trespassed from any public, if, if, like if I walk in and I am wearing a red shirt and you don't like it, from the police station, you guys can trespass me. It's bullshit. That's not how, that's absolutely not how it goes. It's a public building. So if we go into the police station and start recording and you don't like it then you can't throw us out right?

**Affalter**: Correct

**Doerfler**: Yah so it's the same thing, so you can't trespass unless there is a crime committed right?

**Affalter**: In, in essence

**Doerfler**: There is no crime committed here. They just didn't like the words

**Affalter**: Well there's still the, their board policies and what rules, and that's

**Doerfer**: But you're not a policy guy

**Affalter**: I'm, but once they ask you to leave, because it's violating whatever policies they have in place, I still have to

**Doerfler**: Who gives a shit about their policies?

**Affalter**: I don't get to make the decision

**Doerfler**: But you enforce the law

**Affalter**: Correct

**Doerfler**: You're not a policy guy

**Affalter**: Correct. They determine the policy part and once they ask you to leave that's where I step in. That's why I stayed sitting, I didn't [ ]

**Doerfler**: I think the whole point that we're, that here's where we're missing, is like, if, if we were to go to a board meeting that happened to be for a company that's based in Lawrence and you were in there and they could ask us to leave. But since this is paid for by the tax payers of Lawrence it's, you can't ask people to leave just because you have your feelings were hurt, during public comment which the first amendment allows you to express that

**Affalter**: I, I understand that part I'm not, I don't, just like you don't want to be in an argument about that part

**Doerfler**: Sure

**Affalter**: Obviously, we all support people having the right to dispute, that's why I stayed sitting until they said they wanted you to leave. Once they do that I have to abide by the criminal trespass side of things. And I'm not, I'm not saying what you guys were doing was right or wrong. That's not my place to decide at all

> **Doerfler**: I didn't think you were at all. I just think what we're missing this, the public and private part
> **Bishop**: Yah
> **Doerfler**: We gotta go? Alright. Thank you

**99.** Ms. Schmidt was forced to leave the meeting room and the entire building.

**100.** Dr. Spiehs spoke online, when it was his turn, during the public comment section saying "you know what they say, the thing about smart motherfuckers…" Defendant Jones interrupted Dr. Spiehs saying "that's your warning Justin".

**101.** Dr. Spiehs continued "…is they look like crazy motherfuckers to stupid motherfuckers."

**102.** Defendant Jones said "you can turn it off, he's had plenty of warnings." Dr. Spiehs was removed from the meeting disconnecting his Webex connection.

**103.** Mr. Eravi spoke online via Webex next during his allotted time. The dialogue was as follows:

> **Jones**: Michael
> **Eravi**: hello?
> **Jones**: hello Michael
> **Eravi**: I find it interesting that you're still cutting off people for words they say, and, you know, that was a quote from albert einstein. I've noticed in the last couple meetings you've got a lot of inconsistencies happening. some people can say certain things and still come to the meetings, and some people can't. some people can say things if it's a quote, some can't. it's, it's pretty interesting the way all this is working out. I do want to touch on one thing before we get too far, because that educational thing that you guys talked about where you're adjusting for your snow days. you know, I'm sure the parents appreciate you taking care of the kids for a few extra hours over the course of the school year, but how much educational time do you think is happening in the last 15 minutes, or the last 30 minutes of the day, that's just been arbitrarily added to a few days at the end of the year. um, i can tell you as a former student, though it's been a while, that that little time at the end of the school day is nothing, and there's no educational value to it. so, it's another example of how you guys are just checking boxes. you're not actually looking after the kids' interests, and the kids' educational interests. in the ways that you censor people, you're not educating the children about the way this country was founded, and the way this country has operated for what, 250 years? and uh, Kelly jones has

taken it upon herself to just change what our rights are, and to decide what our rights are. that quote that Justin was saying, was by albert einstein. and quoting Albert Einstein, he did say, the thing about smart motherfuckers

**Jones**: This is your warning

**Eravi**: Kelly, I'm doing nothing but quoting somebody

**Jones**: This is your warning, so just keep on keepin on

**Eravi**: How are you giving me a warning for quoting somebody? and now that you've got me online, you're just gonna shut me down as soon as I finish the quote, aren't ya. is that right Kelly? you know, one of the commenters in a video I put up said you need to get a new flobee. cause it ain't working for you. your hairdo needs some work. I'm gonna finish the quote Kelly, because you not gonna silence me. that's what your whole goal has been. as albert einstein said, the thing about smart motherfuckers is …

(**Jones** interrupting): can you shut the thing…

**Eravi**: …they look like crazy motherfuckers to stupid motherfuckers

**Jones**: thank you, ok…

**104.** Mr. Eravi was disconnected from the meeting.

## MARCH 24, 2025 MEETING

**105.** On March 24, 2025, Dr. Spiehs spoke via Webex during his allotted time commenting that he had not received an apology from anyone for board member Anne Costello calling him Crazy Justin Spiehs. Then, to make a point about the treatment of USD 497 books using the same words, Dr. Spiehs said the letters comprising the word "fuck" then said the words he used was spelled Fah-HQ and pronounced it as "fah que." Defendant Jones interrupted Dr. Spiehs with a warning.

**106.** Dr. Spiehs then read from the book "The Hate You Give" contained in the USD 497 libraries and read verbatim in discussing the district library policies "Fuck the police. Fuck the police" and received no warning as he did the prior time. Dr. Spiehs continued saying that the "same words were contained in a NWA song titled Fuck tha police." Defendant. Jones interrupted and said this is "your last warning" and

disconnected him from the Webex connection to the meeting before the conclusion of Dr. Spiehs' allotted time.

**107.** Because Mr. Eravi was banned from USD497 property he appeared by Webex during his allotted three minutes. Defendant Jones permitted Mr. Eravi to spell "fuck" without interruption as well as saying "ass," "damn," "frigate," and "frack" but warned him when he said the word "fucking" and the phrase "fucking shit." The dialogue was as follows:

**Michael Eravi:** So, I'm a little confused here. In what context am I allowed to say the word f-u-c-k? I'm asking a question. Pause the time. I need some clarification here. Pause the time. You guys need to clarify this. Not going to pause the time? You're not going to clarify anything Kelly? You're just going to lash out at people? Is that really what's going on here Kelly? You're just going to lash out at people like a fucking dictator?

**Jones**: Ok, that's your warning

**Eravi**: That's my warning? I'm sorry Kelly, did I hurt your feelings honey? Is that just a little more than you can handle? Is freedom of speech too much for you sweetie pie? No, I, I'm really serious here Hun… are you just so sensitive that you can't handle that? You're an elected official woman. I don't know who the hell you think you are, but you're acting like a damned tyrant. So, what words are acceptable? "Ass" is in the bible. am I allowed to say "ass"? Ass must be okay, I got it. How about "damn"? I can say "damn", ok. How about "frigate". Got it, I can say that one. How about "frack"? Got it. Frack is good. Frack you Kelly. Do you know what that fracking means? Since I can say "frack", we'll just use that one. Since that one's the one that's going to work here. These policies are absurd lady. And the way you're enforcing them, you're going to get yourself sued again. And while we're on the topic of being sued, and your attorney being in there tonight. I'm pretty disappointed in Brad Finkeldei. Cause it's pretty obvious he brought this little 60-day idea to you dumbasses. You're going to restrict people out for the words that they say, and silence them for the words that they say. You've done it tonight, and you continue to do it. I'm going to be back in that room Kelly, and I'm going to say more than "frack you". Do you understand that? I'm going to be back in that room, and I'm going to say a lot more than "frack you, you fracking idiot". You got it? This shit is fucking absurd,

**Jones**: Ok, that's it.

**Eravi**: disconnect the call.

**Jones**: Please turn it off.

**108.** On March 24, 2025, Ms. Schmidt received a letter from defendant Swift at 3:55 pm.  Defendant Swift copied the Lawrence police department.  Swift indicated she had discretion to ban Ms. Schmidt or to give permission to Ms. Schmidt.  Swift stated that unless Ms. Schmidt obtained prior written permission from her that Ms. Schmidt was prohibited from any USD497 property.

**109.** Swift stated the reason for this trespass notice was because of Ms. Schmidt's "disruptive behavior at the USD 497 Board of Education meeting on March 10, 2025."

**110.** Defendant Swift asserted that Ms. Schmidt was "removed from the building for making disrespectful comments, using foul language" and "refusing to leave when requested."  Defendant Swift did not provide any appeal procedure and did not provide any other reasons for the sixty day ban from all USD497 property.  The letter read as follows:

Re: Notice of No Trespass on USD 497 District Property

Dear Ms. Schmidt,

I am writing to provide you this Notice of No Trespass effective March 10, 2025. You are not allowed on any USD 497 property without prior written permission until May 9, 2025. If you choose to come onto district property without written permission and refuse to leave upon request, the Lawrence Police Department will be called to enforce this Notice of No Trespass.

This Notice of No Trespass is being issued because of your disruptive behavior at the USD 497 Board of Education meeting on March 10, 2025. You were removed from the building for making disrespectful comments, using foul language during a public meeting, and refusing to leave when requested. You were notified at that time by the Lawrence Police Department that this No Trespass order would last for 60 days.

If you would like to meet with district administration, please contact the superintendent's office to arrange a phone or Webex conference.

Thank you for your cooperation in honoring this notice. If you have questions, please let me know.

Respectfully,

*Jeanice Swift*

Dr. Jeanice Swift
Superintendent of Schools
Lawrence Public Schools

CC: Lawrence Police Department

**111.** The post hoc reasoning offered by defendant Superintendent Swift in her letter contains false and misleading statements, including the baseless assertion that Ms. Schmidt engaged in "disruptive behavior." Superintendent Swift further claims that Ms. Schmidt was merely "requested" to leave before being "ordered" to leave the building and parking lot—contradicting the reality of a forced removal. The true reason for Ms. Schmidt's removal was her "disrespectful" speech, which serves as nothing more than a pretext for retaliation and blatant viewpoint discrimination.

**112.** On March 24, 2025, Ms. Schmidt appeared by Webex. The following dialogue took place:

49

**Schmidt**: Okay. Good evening. When I learned about your policy regarding obscene language weeks ago I was shocked because I know the kind of reading material you provide the students in this district and they have a lot of obscene words in them. I was surprised because there is no way that the board members are holding their meetings to a higher standard than they have for their students. I don't know if you realize this, but you are teaching minors about obscene language and sex, however you also are expecting those future adults not to say those words in your presence. Make it make sense. I know you are not a fan of the unconventional way I have chosen to communicate this concern I have with you, but I am trying to get you to see the hypocrisy and your policy. You might be offended by the words I have said during public comment, but I am offended by the words you are providing, promoting and allowing minors to read. We are clearly not the same. So last meeting I said some words that you did not like, but like I said those same words are available in your libraries for adolescence to read. I'm going to read some passages from books that are in your District that use those same words. "Tranny" by Laura Jane Grace. "Give me the fucking hormones now, you fucking asshole. I shouted and pounded my fist on the counter. Nearby shoppers stopped to look at this hysterical person shaking with anger, tears running down my face. I've seen all of the fucking doctors that I was supposed to, I passed all the damn tests, here's my fucking driver's license, now can I please have the fucking pills? I'd lost, and how I could ever get it back, or kill the son of a bitch who stole it from me. We were trying to be a family: husband and wife and all that bullshit." This book says fuck 99 times…-

(**Jones** interrupting): Carrie that's your warning

(Webex feed is muted as Schmidt continues to speak and say "…bitch 1 time, shit" yet the only word heard is "it 38 times")

**Schmidt**: -it 38 times. Red, White, and Royal Blue by Casey McQuiston. Through his throbbing hangover, he's got a suspicion all these feelings are why he held off on fucking Henry for so long. You're literally putting your dick in the leader of a foreign state, who is a man, at the biggest political event before the election, in a hotel full of reporters, in a city full of cameras, in a race close enough to fucking hinge on some bullshit like this, like a manifestation of my fucking stress dreams, and you're asking me not to tell the president about it? We don't have time to deal with this, and your mother has um enough to manage without having to process her son's fucking quarter-life NATO sexual crisis, so I won't tell her. But once the conversation is over, you have to. This book says shit 82 times fuck one-hundred fifty…

(Schmidt is completely disconnected from Webex and did not hear the statements Jones said below after being disconnected)

**Jones**: Hey Carrie, that's your last, that's your warning. I do want to point something out. We have provided you policy IF several times, but to be clear, you have never stepped foot in a library, in our district, nor do you know anything about

our curriculum. So, I appreciate your input, but we have given you the policy for making complaints about books.

**113.** The IF policy cannot restrain protected speech, is not a reasonable time place and manner restriction, and does not apply to Ms. Schmidt as it applies to parents of USD497 students.

## APRIL 14, 2025 MEETING

**114.** Dr. Spiehs appeared by Webex at the Board's open meeting,  The following dialogue took place:

**Jones** : All right so we're going to move on now to uh Dr Spiehs and he is also joining us from outside of the district um and uh wishes to talk about previous board meetings. Dr Spiehs?
**Spiehs**: Can you hear me?
**Jones**: We can. Welcome
**Spiehs**: All right I want to speak about uh speak to things that were said on the record at this meeting on February 24th 2025 and I want to ask you guys a question about that. At that meeting a speaker discussed a recent court case ruling and that ruling spoke to the fact that speakers can't be disrupting the meeting with their speech during general public comment even if using vulgar language which you have removed me from meetings here for quote unquote disrupting the meeting because of the words I use. After discussing that the speaker at that meeting then said quote and this is on the record here, this is what that speaker said "So the actual disruption is coming from you assholes up there". Would you agree or disagree that you assholes are actually the disruption?...
**(Jones** interrupting) uh Justin can you refrain, I think you're making a point. We'd like to hear it. Can you refrain from using
**Spiehs**: Yeah the point is that uh…
**(Jones** interrupting): Can you go back 2 seconds? Justin I'm going to give you back your time. One moment. Can you go back 5 seconds?
**Spiehs**: We can't talk about things that were spoken at a meeting before?...
**(Jones** interrupting) No you can. I'm going to give, I want to make sure you have your time. Just a second
**Spiehs**: So again at that meeting this that speaker said quote So the actual disruption is coming from you assholes up there
**(Jones** interrupting): Justin…
**Spiehs**: …and I was wondering if you guys agree or disagree with that. At a previous meeting Kelly you stopped me from speaking because you said I couldn't use quote obscene language. And matter of fact LJ World used that same phrase

"obscene language" when they reported on these meetings. So I want to read to you from the case of Mom's versus uh Moms for Liberty versus Brevard Public Schools because the ruling on the use of obscene language and what is and what is not allowed. And so in that ruling the court writes "During the incident Moms for Liberty cites a member uh shared her concern that her child's elementary school library contained inappropriate books. She began reading one which detailed an in school sexual encounter: 'I swung the uh door open letting a soft light from the hallway shine a spotlight on them. 'Shit' she muttered." Then the court writes "Belford quickly interrupted the speaker when she got to the word 'shit'. That word though not polite is not obscene."…

(**Jones** interrupting): Justin, can you try to make your comments without utilizing uh inappropriate language?

**Spiehs**: So I can't now I can't enlighten you guys on what district courts have ruled on the word shit at public meetings? Is that is that what you're trying to say?…

(**Jones** interrupting): Yes

**Spiehs**: And so that that's what that's what I've been saying this whole time is that the using the word shit is allowed…

(**Jones** interrupting) you can definitely share your viewpoint without doing that. So if you would

**Spiehs**: Well but the viewpoint is that the word shit is allowed and my viewpoint is that I'm reading from this case that said that…

(**Jones** interrupting and directing staff to disconnect Webex): Ok. I'm trying here. That's enough. Thank you

**Spiehs**: …and so matter of fact the court…

(Webex disconnected before time expired)

### APRIL 28, 2025 MEETING

**115.** In the Board's published agenda it omitted providing a public comment section. On April 28, 2025, the board conducted a meeting without a public comment section.

**116.** USD 497 spokesperson Julie Boyle did not give a reason why. She stated that "public comment will be part of the board's May 12, 2025, meeting agenda."

**117.** Mr. Eravi came to the meeting in part to protest the Board's arbitrary decision to eliminate public comments. Mr. Eravi held an 8 x 12 piece of paper stating "My public comment" with an arrow pointing at his white T shirt. The message on his shirt is depicted below:



**118.** Although the Board claims to have a policy that "signs" cannot be displayed, nothing was said to Mr. Eravi about either his paper or his shirt by any board member. Although the Board claimed it has a policy prohibiting "signs" which had no definition of what constituted a "sign," Mr. Eravi carried what could be considered a "sign" or "signs" into the Board's meeting. The Board did not warn or otherwise tell Mr. Eravi that his "sign" or "signs" were not permitted or violated any rule.

**119.** After a meeting adjourns, it is not uncommon for individuals, including audience members, employees, or staff to approach the dais to engage the board or board members in conversation.

**120.** After the meeting adjourned, Mr. Eravi approached the board's dais about his "signs" which he was displaying during the meeting. Two city police officers Bishop and officer Bailey Salsbury were present when Mr. Eravi spoke to the board at the dais after the meeting ended.

**121.** Mr. Eravi spoke to the Board members who were seated behind the dais about how arbitrary and vague it speaking policy was. When Mr. Eravi said "bullshit" and "fucking voicemails" Kimball told Lawrence police who were present "we need help

here" meaning she was directing the police to have Mr. Eravi either removed or silenced.

**122.** Mr. Eravi did not commit any crime at the USD497 open meeting on April 28, 2025.

**123.** Mr. Eravi did not commit any crime in the parking lot adjacent to the USD497 meeting room building on April 28, 2025.

**124.** The dialogue after that meeting adjourned was as follows:

> **Eravi**: How come you don't enforce your policies evenly Kelly Jones? There was a statement read at the beginning of the meeting that said if I had a sign I'd be thrown out. I got my sign. how come I wasn't thrown out? Is your plant making you calm now? How come I wasn't thrown out Kelly? I got my sign
> **Bob Byers**: I'll… (inaudible)
> **Eravi**: Well, she's the president man, she's the one that should have thrown me out. But they don't enforce their policies evenly
> **Byers**: We made a choice, the choice is... is
> **Eravi**: So, then why are you (inaudible)
> **Byers**: Huh?
> **Eravi**: You made a choice, so you just decide willy nilly each time?
> **Byers**: We made a choice, the choice was allow you to disrupt our meeting, or we could tolerate your piece of paper
> **Eravi**: So, you can tolerate my piece of paper this time, but you can't tolerate my words huh?
> **Byers**: It is what it is
> **Eravi**: It is what it is? So, you guys just change the meeting rules to suit your needs? Is that what it is Kelly? You got you a little plant now, going to be nice and calm? And you're busted lying Kimball. You and your gaslighting bullshit with those fucking voicemails
> **Kimball**: We need help here, can we get...
> **Eravi**: You're busted lying. You are busted lying. I can say fuck all I want, I can say shit, bullshit, fuck you…
> **Jones**: You are being disruptive, you need to leave…
> **Eravi**: I can even say cunt. I can even say cunt. There's nothing you can do
> **Byers**: Well, actually
> **Eravi**: And if she's going to have police come up and try to escort me out, get on with it, Kelly. I can say bitch, bullshit, cunt, motherfucker, I can say all these words and there's not a damned thing you can do about it
>     (Police Officers Bishop and Affalter approach the dais  and Mr. Eravi)

**Eravi**: This is what I'm talking... (turning to police) You guys come up here with guns to do something. Go away, there's nothing to do here. You got people up here that think they can call people with guns to enforce their fucking feelings

(turning back to board members)

You're a bunch of pussies. Especially you Crazy Anne Costello. If you guys hadn't been violating rights, and violating a man's freedom of speech, I wouldn't even be here. But you guys decided to throw people out right and left, and act like tyrants, so now you got me here, and I say, "fuck you this much", and there's nothing they can do about it because I'm protected. It's protected speech, you dumb idiots. You chose to be in these positions. You need to pay attention to the rights that we have and honor them. And while I've got all of your attention, pay attention when I say this. If you'd quit shutting other people down, I would not be here. I don't have any kids in this district. I don't have any interest in this. Only my tax money comes to you. But you guys shut down other people, and I will come in here and defend their rights to speak. So, when you're done shutting down other people, you can be done dealing with me, and I'll have a new T-shirt next time. And I will cuss at the next public comment. When I speak, I will speak and choose the words I choose to speak, not the words that you allow me to say. Do you understand? Do each of you understand? Do each of you understand the rights that we have as American citizens here? When you're done shutting other people down, you won't have to deal with me anymore

**125.** While waiting in the parking lot Mr. Eravi a dialogue with officer Salsbury

occurs as follows:

**Eravi**: That was funny that she's gonna call you up thinking that you were gonna throw me out of here.. That's what she thought. You guys need to quit letting these guys use you guys like Gestapo

**Salsbury**: I'm not letting anybody use me

**Eravi**: Yes you are

**Salsbury**: Keeping peace

**Eravi**: there was no 'unpeace' to keep, I was speaking. I was speaking, so where was the unpeacefulness?

**Salsbury**: I didn't say you were, just maintaining…

**Eravi**: So, what did you need to maintain? What was unpeaceful that you needed to maintain?

**Salsbury**: Allowing you to say what you needed to say, just prevention.

**Eravi**: But what were you preventing?

**Salsbury**: Anything from escalating

**Eravi**: Anything from escalating? So why were you assuming things were going to escalate? I'm just here talking

**Salsbury**: There's always the potential right? I didn't say you were. I didn't say you were

55

> **Eravi**: But you guys gotta come up here and surround people at Kelly's insistence. And, when you guys do that, you embolden her to keep doing it
> **Salsbury**: I'm not saying anything
> **Eravi**: You guys are gonna defend our fuckin rights. I'm gonna force your hands on that

**126.** Jones had no legal authority to order Mr. Eravi to leave the room, particularly after the meeting had adjourned. Jones similarly lacked any authority to order Mr. Eravi to exit the building or the adjacent parking lot.

**127.** Mr. Eravi's speech to the Board after adjournment was fully protected under the First Amendment and did not disrupt the Board's meeting in any way.

**128.** While inside the building, no Board member or Superintendent Swift ever informed Mr. Eravi that he was trespassing.

**129.** The close presence and response of police officers conveyed to Mr. Eravi that he would be forced to stop speaking and leave the room, or else face arrest.

**130.** At no point did Jones's statement – "you need to leave" – clearly communicate to Mr. Eravi that he was being formally ordered to leave the meeting, the building, and the parking lot.

**131.** Mr. Eravi then walked around the building to a different exit on the North side of the building and saw defendant Jones exiting.

**132.** Mr. Eravi waited in the parking lot to interview and videotape for his Lawrence Accountability YouTube responses Board members would or would not make to what transpired in the meeting.

**133.** Police officers were present when Mr. Eravi began asking questions of the exiting board members.

**134.** When Jones was questioned by Mr. Eravi, Officer Bishop claimed defendant Jones had trespassed Mr. Eravi from the building and the parking lot.  Bishop claimed that Jones "had ordered you to be trespassed" and that Jones would "mail you a letter, just like last time."  Bishop told Mr. Eravi if he did not leave the parking lot that she would arrest him.

**135.** Byers told Mr. Eravi that "as a board member, I can tell you that you are trespassed."  The Board did not set for any agenda item as to trespassing Mr. Eravi and never voted to authorize that no trespass against Mr. Eravi.

**136.** The recorded dialogue in the parking lot went like this:

**Eravi**: You guys going to quit throwing people out? Kelly Jones? You going to quit shutting people down in here and treating them like shit? You're an elected official lady, for you to hide out inside like that is a joke
**Jones**: Back away from me
**Eravi**: For you to hide out inside like that is a joke. You're an elected official. You have no reason to act that way. You're an elected official
**Bishop**: At this point
**Eravi**: Don't run interference on me
**Bishop**: She's asking That you are
**Eravi**: She's an elected official
**Bishop**: Trespassed from this
**Eravi**: no
**Bishop**: and that you are to
**Eravi**: negative
**Bishop**: leave the property
**Eravi**: You guys are going to trespass me now? For what?
**Bishop**: Because Kelly Jones ordered you to be trespassed.
**Eravi**: Because Kelly Jones ordered me to be trespassed?
**Bishop**: So, it's time that you need to go
**Eravi**: Kelly Jones hasn't told me that I'm trespassed. So, Kelly Jones is going to need to tell…
**Bishop**: no, she doesn't have to tell…
**Eravi**: Yes, she does, you can't do this on behalf of her. She has to be the one to say it.
**Bishop**: She'll mail you a letter too, just like last time
**Eravi**: So, how long am I being trespassed for?

**Bishop**: I don't know, at least for now you need to leave.

**Eravi**: So, you guys are really going to trespass me for constitutionally protected activity guys? I've made no threats, I've done nothing other than stand out here and ask questions, and you guys are going to literally trespass me for constitutionally… (turning to Bishop) Are you really going to do this?

**Bishop**: Yes

**Eravi**: You are?

**Bishop**: Yes, please leave Michael

**Eravi**: Kelly? Is this what you want? (turning back to Bishop) I haven't heard her tell me, and you can't just…, you can't just trespass me yourself. She has to be the one to tell me

**Bishop**: We do it all the time

**Eravi**: She has to be the one to tell me. Nobody has told me I'm trespassed from here but you

**Bishop**: You need to leave, Michael, you need to leave

**Eravi**: She has to be the one to tell me, don't you know that?

**Bishop**: Michael, you need to leave

**Eravi**: I understand, and once she tells me that I'm trespassed, I will leave

**Bishop**: We do it all the time

**Eravi**: Once she tells me that I'm trespassed, I'll leave

**Byers:** As a board member, I can tell you that you are trespassed

**Eravi**: Ok, so you're going to take this for her? (turning to Bishop) And it's under threat of arrest, right?

**Bishop**: You need to leave

**Eravi**: If I don't leave, I will be arrested, correct?

**Bishop**: Correct

**Eravi**: Thank you, that's all I needed. You'll have another lawsuit coming Kelly Jones, and Bob Byers this time. I wouldn't have thrown yourself under the bus like that, Bob

**Eravi**: (leaving) I got what I wanted Kelly. I will be suing your asses. That was a stupid move. Bailey, you're in it too man. That was a stupid move. Send me a letter, be sure to trespass me for at least a year. At least a year. Because I want a good lawsuit out of this. Motherfuckers. That was straight up constitutionally protected activity lady. And you know you guys are screwed on this one. Screwed. Screwed bad. Screwed

**137.** On May 1, 2025, Mr. Eravi received a letter from defendant Superintendent Swift notifying him of a lifetime ban from all USD 497 property: "You are hereby issued a Notice of No Trespass effective April 28; you are permanently prohibited from accessing all USD 497 school buildings and locations." Swift justified the ban by

citing "unsafe, harassing, and threatening behavior you demonstrated in the parking lot following the Board meeting on Monday, April 28, 2025."

**138.** However, Swift fails to explain how this stated reason for the lifetime no-trespass order—speech allegedly made in the parking lot—could be reconciled with the dual declarations from Bishop and Byer indicating that the decision to ban Mr. Eravi had been made prior to any incident occurring in the parking lot.

**139.** Moreover, defendant Swift subsequently cited additional reasons to justify the lifetime ban, further obscuring the basis for this severe and unprecedented sanction::

> Notice of No Trespass is being issued because of your behavior following the Board meeting on April 28. 2025. After the conclusion of the board meeting, you approached the board table. raised your voice and yelled obscenities at board members. When you exited the Board meeting☐ instead of leaving the premises, you walked in the opposite direction to the rear of the building waited several minutes for board members to exit the building, positioned yourself next to a board member's car and made harassing and threatening statements toward board members. This behavior occurred in the presence of the district staff members who were in the area at the time. creating an unsafe and threatening environment for all who were present

**140.** In essence, defendant Swift decreed her own personal restraining order which was unauthorized and provided zero due process when it deprived Mr. Eravi of his rights. Defendant Swift has no legal authority to ban a plaintiff or any individual – particularly forever from public property denominated as USD497 public property.

**141.** Mr. Eravi presented no safety threat to any defendant and the fact that the board member's respective residences are matters of public knowledge or that the press may be present outside those residences or in a parking lot is protected activity and not unique to Mr. Eravi. The press routinely asks questions of public officials

even persisting when the public figure says "no comment" or ignores the press. That too is protected activity.

**142.** The ban on Mr. Eravi was based on reasons stated by Superintendent Swift that were entirely pretextual and false, as all of Mr. Eravi's actions posed no safety threat and constituted protected free speech and freedom of the press activities.

**143.** Swift's letter imposed a retroactive, lifetime ban effective April 28, 2025, without providing any opportunity for appeal or due process either before or after the deprivation of Mr. Eravi's rights.

**144.** The letter contains false, post hoc, and pretextual justifications for the no-trespass order. Mr. Eravi did not create any "unsafe" or "threatening" environment, especially given the presence of two armed police officers standing beside him. He neither possessed a weapon nor engaged in any unsafe behavior; he did not utter "obscenities" as legally defined, was never told to "leave the premises," and made no "harassing" or "threatening" statements toward any Board member as defined under Kansas law. All of Mr. Eravi's speech was fully protected by the First Amendment. The substance of the letter is depicted below:

**Lawrence Public Schools**
110 McDonald Drive
Lawrence, KS 66044


Thursday, May 1, 2025

Mr. Phillip Michael Eravi,

Due to the unsafe, harassing and threatening behavior you demonstrated in the parking lot following the Board meeting on Monday, April 28, 2025, you are hereby issued a Notice of No Trespass effective April 28; you are permanently prohibited from accessing all USD 497 school buildings and locations.

This Notice of No Trespass is being issued because of your behavior following the Board meeting on April 28, 2025.  After the conclusion of the board meeting, you approached the board table, raised your voice and yelled obscenities at board members. When you exited the Board meeting, instead of leaving the premises, you walked in the opposite direction to the rear of the building, waited several minutes for board members to exit the building, positioned yourself next to a board member's car, and made harassing and threatening statements toward board members. This behavior occurred in the presence of other district staff members who were in the area at the time, creating an unsafe and threatening environment for all who were present.

In the future, your presence at any Lawrence Public Schools location will result in an arrest.

To clarify, you may continue to attend board meetings via Webex and you may also contact me or the board via email.

Thank you for your cooperation in honoring this No Trespass Notice.

Sincerely,

*Jeanice Kerr Swift*

Jeanice Kerr Swift
Superintendent
Lawrence Public Schools

**145.** Defendant Swift's declaration that Mr. Eravi's "presence at any Lawrence Public Schools location will result in an arrest" unlawfully infringes upon Mr. Eravi's liberty interests—including his rights to associate, petition the government, and participate in public forums. This restriction extends even to events held on USD 497 property

during non-school days or hours, where USD 497 has already divested control over individual attendance through contractual agreements.

## MAY 12, 2025 MEETING

**146.** Mr. Eravi appeared by Webex at the Board's May 12, 2025, meeting. The dialogue was as follows:

**Kimball**: First up will be Michael. Michael, are you there?
**Eravi**: Yeah, can you hear me?
**Kimball**: Yes, we can hear you
**Eravi**: So, now that everybody's present, except for I guess Kelly Jones took off. Umm, I'm sure she's got more important matters to contend with than just being president of the school board. I wanted to revisit how this whole thing came about with this permanent ban that you, you've unconstitutionally enacted. You know, back in January, you had a situation developing in your schools. At the same time, you had an individual speaker in the school board that you didn't want to hear from. So, you decided to unconstitutionally shut that person down. I sent you an email saying that I would come in there and challenge that aspect of your tyranny… shutting someone down unconstitutionally during their public comment. And at the same time, you know, you've got things going on in your school district that I guess you, you might have wanted to not talk about. So, you started playing games with public comment. So, I came in there in February, and you know, Kelly Jones and I had this little charade for about 30 minutes where she was trying to control what I say and trying to get the police to control me, and that didn't work. So, obviously there was no crime. But your superintendent still trespassed me from school district property for 60 days. That's a little difficult, since it's public property, and there was no crime, obviously by police officer standards. So, during that time, you know, things started breaking, news started breaking about a teacher, you know, doing these strange tests on kids' tongues. You know, we had quotes like "my kid was sexually assaulted by your employee". There was uh, actually a cartoon, "My child was bullied to the brink of suicide" was one of the quotes. Another quote was, "It took a restraining order to protect my kid in your school". But you guys, instead of paying attention to those things you were sweeping under the rug, instead, you decided to make a spectacle of public comment. And all people were saying is that your policies are bullshit
**Kimball**: Michael, That's your warning
Eravi: So, I get a warning. Gotcha. But that's the fact. And you guys are so worried about people being so mean to you. And… We move forward. I come back in the room. You don't have public comment because you don't want to hear from the public still. You move public comment to the end. At the end of the meeting last time, I go outside and ask elected leaders questions as they're leaving the building.

And your superintendent decides to unconstitutionally ban me for permanent, lifetime. You guys have that cartoon in mind? The one that says, "Everyone look how mean they're being to me"? Instead of paying attention to your students you're sweeping under the rugs? Your policies really are bullshit

**Kimball** (stopping time early): Your time's expired, thank you

147. Dr. Spiehs appeared by Webex at the May 12, 2025 Board meeting. The dialogue

went like this:

**Kimball**: Okay our next commenter is Justin.
**Spiehs:** Can you hear me?
**Kimball:** Yes we can. You may proceed
**Spiehs**: Can you hear me?
**Kimball**: We can hear you, you may proceed.
**Spiehs**: All right my name is Dr Justin Spiehs, my name is Dr Justin Spiehs uh your guys' policy that you just read there on general public comment says that complaints about staff are not allowed and so do you think that that is or is not viewpoint discrimination that uh only positive things can be said about your precious staff there? So we all just had to sit through the superintendents report there where she gushed over staff and then we listened to the Avid presenters just say positive things about uh staff as well but if I were to say that the superintendent Swift is a tyrant for not allowing me to go to church on school district property because she's imposed an unconstitutional permanent ban on me uh for no reason would that be allowed? Would that complaint be allowed? That's part of the lawsuit that I filed against all you guys there is that you allowed positive things to be said but not negative things. And so think about it anybody that tunes into your guys' precious meetings here will only see these positive things that are said about the school district but anything negative whatsoever uh has to be shielded from the eyes of the public in an executive session. So that's what's called viewpoint discrimination. And so a couple meetings ago there Shannon Kimball you sat there and played the victim and said that you'd gotten some voicemails from uh people that were watching the meetings and you classified it as threats bullying and intimidation and uh we got those voicemails through an open records request. And so I just want to read some of them and I want to I want to show uh how you're a lying beotch, Shannon for what you said up there...
(**Kimball** interrupting) Okay, that's your warning Justin thank you
**Spiehs**: ...and so one of the emails says quote Hey you dirty cunt stop breaking the law...
(**Kimball** interrupting): Okay, you're done Justin thank you. Cut him off
Spiehs: ...we need less people like you in positions...
(Webex disconnected before time expired)

## MAY 27, 2025 MEETING

**148.** Dr. Spiehs spoke on Webex during his allotted time with the following dialogue:

**Jones**: Okay we have one uh virtual comment so uh Dr Spiehs. Can we pause the, till we get him on there? Dr. Spiehs are you with us?
**Spiehs**: Can you hear me? Can you hear me?
**Kimball**: We can. Welcome
**Spiehs**: All right my name is Dr Justin Spiehs. The USD497 school board is enforcing an unconstitutional policy that prohibits speakers from using foul language during general public comment. This board has removed me from several meetings for the words I used while speaking during my general public comment time. In order to speak here at the meetings people must sign up via email prior to the start of the meeting and when signing up to speak during general public comment speakers are asked to provide a topic they wish to discuss. For tonight's meeting I signed up and the school district approved my topic. In my signup email I made it clear that the topic I wish to discuss and the words I'm going to use to discuss that topic are quote How Kelly Jones's restriction of free speech during general public comment is complete fucking bullshit…
**(Kimball** interrupting): That's your warning
**Spiehs**: …close quote. Well if you have a problem with the words I was going to use here tonight then why did you approve me to speak using those words? Seems like you gave me the okay to say those words otherwise you would not approve me to speak those words right now there Kelly. So I've been trying to figure out which words are not allowed here during general public comment. I've asked you all for a list of prohibited words but I haven't heard back from you on that. Other people have asked you for a list as well and you haven't provided one to them either. So no one knows what is allowed and not allowed other than the vague "foul language" you say is prohibited. So tonight I want to let the community know what is and is not allowed here in case they want to come speak here someday. And this is what I've learned so far: you can say dumbass and damn and hell. You can spell f-u-c-k-i-n-g but you can't say fucking…
**(Kimball** interrupting): Okay
**Spiehs**: You can't say beotch even though it is not a cuss word you…
                 (Webex disconnected before time expired)
**Kimball**: Thank you Dr Spiehs. Okay, um and we'll move on to folks that are here.

**149.** Ms. Schmidt spoke next in person with the following dialogue:

**Jones**: Welcome Carrie, I don't have the topic, but I believe you typically talk about banning books
**Schmidt**: Okay. You are consistently interrupting and banning people during their designated three minutes to speak to the community, due to the words you have defined as obscene. However, the reading material you are providing to minors use

those same words. So again, I am here to inform you of your double standard. I'm going to start off reading from a book called Concrete Rose by Angie Thomas. It is located at Southwest Middle School, Billy Mills Middle School and both high schools. It says ass 109 times, shit…

(**Jones** interrupting):Carrie…

**Schmidt**: …151 times…

(**Jones** interrupting): Can you please explain your point without using that word?

**Schmidt**: …Bitch seven…

(**Jones** interrupting): Okay you need to sit down

**Schmidt**: …times. Cock…

(**Jones** interrupting): Carrie, that's it

**Schmidt**: …two…

    (unknown to Schmidt Jones mutes Schmidt's microphone as Ms. Schmidt
        continues to read while her 3-minute timer is running)

(**Jones** interrupting): that's it. Do you need help leaving?

(Unknown to Schmidt her microphone is muted and continues to read her speech)

**Jones**: Do you need help?

    (Schmidt continues to read her speech unaware her microphone was muted)

(**Jones** to police officers in the room): Can you help her leave please? Oh you cannot

(**Swift** to Jones): We'll no trespass her

(**Jones** to Swift): Okay

(**Jones** to police officers): Got it thanks

**Schmidt**: [continues to read her speech with muted microphone]

(**Swift** to Jones): So she'll be no trespassed

**Jones**: Okay that's three. Carrie, you know you're at your 3-minutes could you sit down please? Okay, thanks for coming up to Lawrence

**150.** On May 27, Chris Flowers appeared in person and spoke during his allotted time at the USD497 open meeting. Flowers stated "so far this meeting's been bitchin' and I just wanna say I came here I'm I want to start with this new noon sign up thing." Mr. Flowers was not warned by the presiding board member.

**151.** When the meeting ended Ms. Schmidt saw Jones in the parking lot and had questions for Jones. Ms. Schmidt approached her and in a normal voice and without

any display of anger where she asked this public figure questions. The dialogue was

as follows:

**Schmidt**: Kelly, hey Kelly, I have a question. Why is it that you let like Chris…
(**Jones** interrupting) Step back away from me now
**Schmidt**: I'm not, I'm not threatening. I'm asking you a question, just like I would if I would be…
(**Jones** interrupting): We will be no trespassing you, that's what's going to happen now
**Schmidt**: Why?
**Jones**: You need to get away from me
**Schmidt**: I'm, just asking you a question, just like if you were at Walmart I would ask you the same thing
**Jones**: You would not, you know what you are doing
(Jones shuts her car door while sitting inside and officer Bishop approaches)
**Bishop**: Caaarie
**Schmidt**: No I would, what am I doing?
**Bishop**: Let her leave
**Schmidt**: What am I doing? She's a constituent, like I'm a constituent of hers basically. She is in the state of Kansas and she's acting like this?"
**Schmidt**: And I'm going to get trespassed because of this? She's going to trespass me because of this?
**Bishop**: Hey Kelly, just go
(Jones opened her car door while sitting in it)
**Schmidt**: You're going to trespass me, because of this?
**Bishop**: I would just leave
**Jones**: I don't want
**Bishop**: See, I would just leave
**Jones**: Okay
**Schmidt** to Bishop): Like I'm a threat, because I said cuss words and I'm asking her why,… like she's treating people differently. Like I don't, I don't understand this.
                    (Jones leaves parking)
**Schmidt**: And here we are, because I'm a threat, because I cussed? Like if I was such a threat, then why didn't you ask me to leave? I'm, I'm asking you a question officer
**Schmidt**: If I was such a threat why is it that you, why is it that you would, you would na, you're walking away from me? What is your badge number?
**Schmidt**: Officer what is your badge number?
**Bishop**: 1304.

**Schmidt**: So why aren't you ask, answering me my questions?
**Bishop**: Carrie, you need to leave the meeting…
**Schmidt**: I need to leave the meeting? This is a public area. What do you mean I need to leave the meeting?
**Schmidt**: are you kidding me right now? Oh wow. That's unbelievable

**Schmidt**: I have a question. Can I ask you a question please?
**Bishop**: I gotta put the dog up
**Schmidt**: Which I'm, I'm, I think… hello? Are you ignoring me?
**Officer Salsbury**: No, no she's *inaudible* up"
**Schmidt**: No, but she's walking away from me
**Bishop**: Carrie I'm leaving, I'm done
**Schmidt** to Officer Bishop: "No, but I have a question. I don't understand why is it that you don't wanna like, like what did I do
**Schmidt**: …that was wrong?
**Bishop**: You've been trespassed
**Schmidt**: No…
(Bishop shuts her car door)
**Schmidt**: Why did, why? What did I do that was wrong?
(**Schmidt** to Salsbury): Ma'am. Other officer. Other officer. What did I do that was wrong? Ma'am. What did I do that was wrong? What did I…
(Salsbury starts to drive away)
**Schmidt**: …do that was wrong? What did I do that was wrong? Oh, you're gonna ignore me too? Is this real life? Wooow, like I'm like some evil person? This is outrageous

## JUNE 9, 2025 MEETING

**152.** On June 9, 2025, Mr. Eravi spoke by Webex at the open meeting and the following dialogue occurred:

**Eravi**: Oh, You can hear me?
**Jones**: Yea, we can now
**Eravi**: See, that's the difficult thing about this Webex thing. But ah, Good evening everyone, and Fraulein Jones. I wanted to start with just a little comment, Ire Politik ist Schwachsinn. I've said that a number of times, and I don't understand what's going on with the board.
I look here, and I see a comment from Dr Courtney talking about book banners, trying to usurp an issue. I don't remember anybody wanting to ban a book. Why are you guys fucking lying to us?
**Jones**: Ok Michael, that's your warning

67

**Eravi**: A warning? Well, Scheizafunden. I don't understand that either. I get a warning at two minutes, now if I was in person, where would we be right now? Would you be asking the Police to "help me out"?  Cause that's what you Schweinzukas did two weeks er ah, several months ago, two weeks ago, three weeks ago. You've done it how many meetings now? They won't help you. Just so you're aware "Ire Politik ist Schwachsinn" means, your policies are bullshit
**Jones**: Kay Michael, that's the end of the
**Eravi**: No, that's not the end of the. I've got what, a minute ten left…
   (Mr. Eravi is disconnected with 1:10 minutes remaining in his speaking time)

**153.** Dr. Spiehs spoke via Webex and the following dialogue occurred:

**Spiehs**: Man, I got to say that really sounded like foul language uh spoken in a different language when Michael was talking there. And you didn't have a problem with that. So why is that foul language allowed? I'm sure there's some German foreign exchange students that are listening that you got to protect their ears for right? What's the difference there? So my name is Dr. Justin Spiehs. It's funny how the local Democrats bitch about Trump trying to take away power and limiting protests on campus which he does. This past year has seen KU, the city commission and you all start implementing changes to stifle public involvement. Why is that foul language allowed right there? So it's funny how the local Democrats bitch about Trump that b-i-t-c-h used like that is allowed but bitch in another way isn't allowed? Is that what's going on here?…
**(Kimball** interrupting): Dr. Spiehs
**Spiehs**: …so I noticed in last week, uh last meeting you allowed a speaker to say exactly what I just said right there without warning him either. So he was allowed to say, heaven forbid I say here b-i -t-c-h and I'm allowed to say it here now as well. Doesn't make any sense. So in order to better be able to exercise our rights at your meetings, I'm starting a petition, a petition that aims to help citizens know what can and cannot be used at your meetings here. And I'd like for each of you to consider signing it. The name of it is the Full Uncensored Communication At Meetings petition and that acronym is F.U.C.A.M. which is pronounced fuck am…
**(Kimball** interrupting): Dr. Spiehs. That's your warning
**Spiehs**: …and so I would like to have you guys consider signing the F.U.C.A.M. commission, uh petition that I'm circulating…
**(Kimball** interrupting): Dr. Spiehs
**Spiehs**: …so is it allowed to say uh F.U.C.A.M. like that? Is that what it is?…
**(Kimball** interrupting): No
**Spiehs**: But you can't say F.U.C.A.M. in a different way?…
**(Kimball** interrupting): Okay. Please do send us the petition. Okay. Thank you
**Spiehs**: You want me to send you the F.U.C.A.M. petition? Is that what you're saying?
**Kimball**: Yes
           (Webex disconnected prior to Dr. Spiehs' allotted three minutes)

## JUNE 23, 2025 MEETING

**154.** Dr. Spiehs spoke on Webex on June 23, 2025, with the following dialogue:

**Spiehs**: Okay my name is Dr. Justin Spiehs. I want to pick up where I left off last meeting when uh I got removed from the meeting while speaking I was telling you guys about a petition that I was wanting to uh have you guys consider signing and the name of that petition is the Full Uncensored Communications At Meetings petition and I was telling you guys that that acronym is F.U.C.A.M. and is pronounced fuck am and you removed me from the meeting Kelly and I just want to say but that's not a that's not a naughty word. The F-U-C-A-M is not a naughty word. And so what do you want me to do about that? You want me to change the name of my petition because what you say I can't say that in here? I was listening to a speaker in this meeting earlier talking about their organization called uh the P-A-L organization PAL and they got to say their name no problem whatsoever. So what I got to change my name to what make it through your gatekeeping of the words we can say here? I mean it's not my fault that my petition is called that. I mean what do you want me to do about it? I got to change it? No! I mean it loses its meaning if I got to change it to meet your standards there uh Kelly Jones. And so that's also viewpoint discrimination. So you're going to allow someone to come in with their what whatever you know organization it is and they can say it just fine but heaven forbid Justin say F-U-C-A-M. Oh no! Oh look out! And so along with that that goes into my petition or why I need to do a petition is two meetings ago there was a speaker in here that said during general public comment said "Democrats like to bitch about Trump" and I'm still looking for an answer on why he was allowed to say that when b-i-t-c-h when I've been removed from the meetings for saying biotch which ain't even a naughty word again. I mean it you know it's again it's viewpoint discrimination. So you're going to allow one person to come in here and say "bitch" but as soon as I say "bitch" then you know you got to you got to immediately remove me from the meetings. And so that all goes into my petition again that's called the F.U.C.A.M. petition and I'd really like for you guys and everyone out there to consider uh signing the F.U.C.A.M. petition…
**(Kimball** interrupting): Okay. Dr. Spiehs
**Spiehs**: …because I mean that's what that's what we're that's what we're looking for we're looking for Full Uncensored Communications At Meetings…
**(Kimball** interrupting): Okay
**Spiehs**: And so I just invite everyone to consider thinking about if that's what they want if that's what they want then they can sign the F.U.C.A.M. petition so we can start saying "bitch" at the meetings again. I mean Jeez is this America or what?
**(Kimball** interrupting): Okay. Dr. Spiehs
**Spiehs**: Bunch of tyrants running the board up there. You guys make me sick with your double standards and your discrimination in viewpoints up there and the words you say that we can't say in there. I mean we're adults here for crying out loud.

**Kimball**: Thank you all right um uh Carrie.

**155.** Ms. Schmidt was given permission to speak via Webex for three minutes with the following dialogue:

**Schmidt**: I'm going to read a transcript of the conversation that took place in May where I was wrongly accused of harassing and threatening Kelly the fake victim. First I want to say the fake victim is not full of grace, nor is she doing a good job following the Constitution. During my speech my mic was silenced in May and there was a hot mic moment where Miss Superintendent told the fake victim that she would trespass me. I assume she said that because I read cuss words that are written in one of the books that this district provides to minors. However, the permanent ban letter stated quote You made harassing and threatening statements towards the board president. This behavior created an unsafe and threatening environment for those who were present. End quote Mind you the people present were Officer Lindsay Bishop, the police dog, the fake victim and myself. The fake victim and I were at least over 6 feet apart during the entire interaction. Carrie says Kelly, hey Kelly I have a question. Why is it that you let Chris Fake victim interrupts and says Step back away from me now. Carrie says I, I'm not threatening I'm not threatening I'm asking you a question just like I would if I would be. Fake victim interrupts again and says We will be no trespassing you. That's what's going to happen now. Carrie says Why? Fake victim says You need to get away from me. Carrie says  I'm just asking a question. Just like if you were at Walmart I would ask you the same thing. Fake victim says You would not, you know what you were doing. Fake victim shuts her door while sitting inside of her car. Officer Bishop says "Caaarrie" in a condescending tone. Carrie says to officer Bishop No I would. What am I doing? Officer Bishop to Carrie Let her leave. Mind you, I'm over 6 feet away from the fake victim and standing closer to the police officer and her dog at the entire time. Carrie says to officer Bishop What am I doing? She's a constituent, like I'm a constituent of hers basically. She is in the state of Kansas and she's acting like?" The fake victim starts her car. Carrie says to officer Bishop And I'm going to get trespassed because of this? She's going to trespass me because of this?" Officer Bishop says to the fake victim Hey Kelly just go. Kelly opened her car door while sitting in it. Carrie says You're going to trespass me because of this? Officer Bishop says to the fake victim I would just leave. Fake victim says to officer Bishop "I don't want." Officer Bishop then says to the fake victim See I would just leave. Fake victim says to the officer Bishop Okay. Fake victim shuts her door. Carrie says to officer Bishop Like I'm a threat because I said cuss words and I'm asking her why. Like she's treating people differently. Like I don't, I don't understand this" Fake victim backs out of the parking spot, mind you I'm standing next to the officer and her police dog this entire time. Carrie says And here we are because I'm a threat because I cussed Someone tell me how I fucking threatened and harassed an elected…

(**Jones** interrupting): And that's your warning Carrie.

**Schmidt**: …government official based I just read? I want to know if anyone involved in the writing of the ban letter ever thought to ask me what happened or check the officer Bishop's body cam before writing the bullshit letter…

(**Jones** interrupting): Kay

**Schmidt**: … or did officer Bishop conveniently not have her camera on because she's trying to hide the fucking truth? So the fake vi….

(Ms. Schmidt's Webex connection is disconnected with 6 seconds left on her allotted 3 minutes)

156. Mr. Eravi appeared by Webex during his allotted three minutes with the following dialogue:

**Eravi**: Tried to unmute, are you doing Carrie or Michael?

**Jones**: It's ah, you're free to speak

**Eravi**: Am I?

**Jones**: Can you restart his time

**Eravi**: Am I free to speak?

**Jones**: Just a minute, there you go. Go ahead

**Eravi**: So you, you said there that I was free to speak. I really question what that means. Are you able to clarify that at all? I mean, what I saw just a minute ago was uncensored speech. Did you really let Justin say those words? You know, talking about the FUCAM petition and talking about another speaker that used the word bitch? Have you finally climbed down off your fucking high horse

**Jones**: Ok, that's your warning.

**Eravi**: Oh! So, certain usage does get a warning still. Thank you Kelly, I just wanted to clarify where we stood there. Since you spent the first 20, meh, 15-20 minutes praising yourself tonight

**Jones**: Agreed

**Eravi**: I couldn't, I couldn't see how that was gonna be uh, what are you agreeing on? Pause my time. That was an interruption, please pause my time

**Jones**: It's fine, pause it, and give him back 5 seconds

**Eravi**: What was that interruption? You were agreeing on something. What was that interruption?

**Eravi**: Pause my time. The way you run this meeting is incredible Kelly Jones. Since you spent the first 20 minutes of this meeting praising yourself and taking all kinds of accolades, I want to make sure that everyone on that board, as well as your school board president is aware of the words you said to me.

(playing a recording)

**Eravi**: Fancy seeing you guys here. You think you're going to have the police like, arrest me today Kelly? No? You don't think so here?

**Jones**: I actually, I wish you well

**Eravi**: But you are thinking you're gonna get away with it at the school district?

**Jones**: I, If you're not treating somebody

**Eravi**: You realize you're violating the law at the school district? Banning people for free speech

**Jones**: I don't want to ban anybody for free speech. I definitely want you to be able to give your, your point of view

**Eravi**: How about you lift the ban and let me come back into the school meeting?

**Jones**: How about you talk the way you should in front of a five year old? I actually, there's things…

**Eravi**: How about I can say the word "fuck" anytime I want Kelly?

**Jones**: Ok, you can, you definitely can here

**Eravi**: And I can say it inside that school district office too

**Jones**: Ok

**Eravi**: So why are you kicking me out? Why are you using police to express your feelings?

**Jones**: I definitely didn't kick you out for that reason

**Eravi**: What reason did you use then?

**Jones**: You got a letter

**Eravi**: I got a letter

**Jones**: You did

**Eravi**: Ok, so now you're banning me for the free speech outside on public grounds

**Jones**: I, I'm glad you're here

**Eravi**: So now…

**Eravi**: As we can see here, as we can see here, there's nothing going on, that is anything that is anybody's problem or anything. But, yet, at the school district, you're gonna have police arrest me

**Jones**: That is not why we had the police arrest you

**Eravi**: It's your feelings Kelly, there was nothing, there was nothing. What am I doing here that is different than at the school district?

**Jones**: You're not doing anything different here than at the school, than, having a conversation ok

**Eravi**: Then why are the police, why aren't you having the police called…

(end of recording)

**Eravi**: You aren't doing anything different than at the school district other than having a conversation with me. Those are your words, Kelly. Dr. Swift, your fucking ban needs to be lifted.

**Jones**: Ok, that's it, that's, that's it (connection prematurely disconnected)

### JULY 14, 2025 MEETING

**157.** Dr. Spiehs spoke via Webex on July 14, 2025, at the Board open meeting with the following dialogue:

**Spiehs**: All right. So, earlier in the meeting here tonight, uh, GR Gordon Ross was voted in as president of the school board. And you know what's interesting about that is that GR was voted out by the community of Lawrence in November of 2021 and then these dumb asses on the board voted him back on the board…

(**Ross** interrupting): Justin, that's your warning

**Spiehs**: For what? For what? In August of uh anyways, I was I was interrupted right there. And so anyways, uh the dumb asses on the board voted him back on the board in August…

(**Ross** interrupting): Okay Justin, we're going to move on to comment from Trisha

**Spiehs**: …2022 after a board member resigned

(Webex disconnected prior to three minute expiration)

**Ross**: Trisha Massenthin, are you here? Fantastic. We'll have James turn the mic on for you

## JULY 28, 2025 MEETING

158. Dr. Spiehs spoke via Webex on July 28, 2025, at the Board open meeting with the following dialogue:

**Spiehs**: Hey, uh, Raggedy Anne Costello, I see your mute button is working this meeting. Remember that meeting when you called me Crazy Justin Spiehs on your microphone? I remember. Last meeting I was removed from the meeting by Gordon Ross as I spoke during general public comment for saying a naughty word and the word was d-u-m-b-a-s-s-s-e-s. And even worse, I said it twice. Oh no. But a speaker at a previous meeting wore a shirt that said the word d-u-m-b-a-s-s and he also said the naughty word d-u-m-b-a-s-s but I can't? Is that unequal protection under the 14th amendment of the United States Constitution? Is that retaliation against me? Is it viewpoint discrimination? Seems like it. But if I can spell naughty words here at the meetings and people can wear naughty words on their clothes, then why can't I say these same words? You say it's because students may be listening to the meetings, but are you saying they don't know how to spell? You're the school board. Are you saying your students can't spell? It's a lame excuse. It's called free speech, guys. And what I was going to say last meeting before being removed by Gordon Ross for saying naughty words was that last meeting Gordon Ross was voted president of this school board. But people might not remember that Gordon was voted out of his school board position during the November 2021 election. And then these idiots on the school board voted him back on the board in August of 2022 after a board member resigned. Now you're president. A guy the community no longer wanted on the board is now running the board. He's unelected and is now running the board. And so with leadership and decision makers like that on this board, it's no wonder you all hired a teacher that raped students in your schools. You're foolishly more worried about adults saying naughty words here during the meetings than you are for properly vetting teachers to make sure you aren't hiring

73

child sexual predators. Get it together, guys. Have some perspective. I want to talk about my Fully Uncensored Communications At Meeting petition that I'd like for you guys to consider signing. And that acronym is F.U.C.A.M. and it's pronounced fuck am…

(**Ross** interrupting): That's your warning, Justin

**Spiehs**: Well, Gordon, F-U-C-A-M is not a naughty word. That's uh F-U-C-A-M. It's pronounced fuck am…

(**Ross** interrupting): Thank you, Justin, for joining us this evening

(Webex disconnected prior to three minute expiration)

**Ross**: All right, so we're going to move on to Carrie

**159.** Ms. Schmidt appeared by Webex with the following dialogue on July 28, 2025:

**Schmidt**: You know, this weekend the craziest thing happened to me. I was in Walmart, and I walked up to an employee and asked them a question. They let me ask them a question and they    didn't interrupt or tell me that they were going to trespass me. Then, wildly enough as I walked back to my car a woman and her son, who I didn't know, approached me in the parking lot and asked me for money. I kindly answered her with "no thank you" and got in my car and drove away. It's crazy how people communicate these days by asking each other questions…unless, you are Ms. Kelly Jones, whom after my last speech, we all know as the Fake Victim. The Fake Victim, campaigned to work for "We The People," yet doesn't let you ask her questions in a parking lot, even when Officer Bishop and her police dog is present. The Fake Victim lies about her interactions with people who don't agree with her choices and gets her bestie, Miss Superintendent, to entertain and cosign her lies by trespassing people from public property when they have not broken a law. I was not threatening or harassing by trying to ask a question of an elected official. If I was, I am sure Officer Bishop and her police dog wouldn't have ignored me, by turning their back on me, to walk upstairs and back into the building. My ONLY crime is calling out these lying board members, along with Miss Superintendent and fighting for freedom of speech. I guess the Constitution doesn't apply when it comes to USD497's board room, yet in the district libraries anything goes. To the community, this school board needs to be spending time figuring out real issues verses silencing people. They sit up there and pat themselves on the back during every meeting when school absences in Lawrence have gone up 82% to the point where the average student misses more than 3 weeks of school in a year. USD497 has lost 3 times more students than any district within the Topeka to the Kansas City commuter corridor, equaling out to be approximately 1,600 students, all while the population of Lawrence has grown every year. But they lie to your face and tell you that it is due to birth rates being low and how there isn't enough affordable housing. Vote Kelly Jones, AKS The Fake Victim and Shannon Kimball out in November, because like President Trump once said quote, They don't know what the fuck they're doing End…

(Ross interrupting): That's your warning Carrie

Schmidt: … quote. This board is full of hypocrites who provide the same words to minors that I have said in here and been removed. I have told the truth about how their policy is bullshit…

(Ross interrupting): Thank you Carrie for joining us this evening

Schmidt: and unconstitutional. Like former Pres…

(Webex connection severed before expiration of Ms. Schmidt's allocated 3 minutes)

### AUGUST 11, 2025 MEETING

**160.** Mr. Eravi spoke via Webex on August 11, 2025, at the Board open meeting.

**161.** When an individual is now given a Webex connection the individual is now able to hear speakers at the meeting but that wasn't the case in January 2025 through February of 2025. The individual waits to speak on Webex the microphone is muted by the Board and sometimes a timer appears as below as with Mr. Eravi:



**162.** The following dialogue took place at the meeting:

**Eravi**: How many times am I gonna to unmute? Can ya'll hear me?
**Ross** Yes
**Eravi**: K, I unmute and you guys mute me again. What's that all about? Just gonna start the time, ok. To hell with it, it doesn't matter. Got a lag from the uh host now,

where's the host at? I can't see the board anymore. We just shut down the video there? How come it's lagging? Can you guys not run your web shit correctly?
**Ross**: That's your warning Michael
**Eravi**: oh! Gordon, is that you? Gordon, is that you giving me a warning? So you wanna get mixed up in this too? Your tyrannical bullshit isn't gonna work buddy
**Ross**: Here we go, thanks for coming Michael. alright, we're gonna move on
**Eravi**: So you're just gonna shut me off huh?
          (Webex disconnected prior to three minute expiration)

**163.** Ms. Schmidt spoke via Webex on August 11, 2025, at the Board open meeting

with the following dialogue:

**Schmidt**: Yesterday there was a post on X about this school district that was pretty alarming. It even got the attention of Harmeet Dhillon, who is the Assistant Attorney General to Pam Bondi. She used one word when she retweeted the post and that word is problematic. This X post that has been seen by over half a million people was about your LGBTQ Advisory Guide. The post stated QUOTE Kansas school district @usd497 advises that kids can use the locker room and be on sport's teams that correspond with their gender identity instead of their s*x. This is a direct violation of Kansas law and Trump's EOs. END QUOTE I want to know why you aren't following the Law when it comes to men in women's spaces and activities? I would also like to know if you still are disciplining up to termination your faculty, staff, and even substitutes for not using preferred pronouns of students? A reoccurring theme with this district is you don't follow the law. Maybe you all should stop being problematic, then you wouldn't have so many issues. So, moving along…

Lucky by Alice Sebold is a disturbing book that is in your school district for adolescents to read. It is available for those precious children, you are so called protecting from hearing foul and obscene language at these board meetings. To everyone listening know that what I am about to read is what this board of education and superintendent believe is appropriate for the students of this district to be exposed to, but they have deemed adults saying a cuss word during public comment as a crime

He lay down on top of me and started humping. ...He worked away on me, reaching down to work with his penis. I stared right into his eyes. I was too afraid not to. He called me bitch. He told me I was dry. I'm sorry," I said- I'm a virgin. He began to knead his fist against the opening of my vagina. Inserted his fingers into it, three or four at a time. Something tore. I began to bleed there. It was wet now. It made him excited. He was intrigued. As he worked his whole fist up into my vagina and

pumped it, I went into my brain. He grabbed my breasts. He twisted the nipples with his fingers, lapped at them with his tongue.

Give me a blow job he said. I want a blow job. He held his dick in his hand. Put it in your mouth. I kneeled before him. He grabbed my head. Put it in your mouth and suck he said. I took it in my hand. He shoved my head forward and I put it in. It touched my tongue. The taste like dirty rubber or burnt hair. I sucked in hard. Not like that he said and brought my head away. Don't you know how to suck a dick? No, I told you, I said. I've never done this before. Bitch he said. His penis still limp, he held it with two fingers and peed on me
The book Lucky says bitch 6 times, it says…
(**Ross** interrupting): That's your warning...
**Schmidt**: …fuck 7 times…
(**Ross** interrupting): Thank you Carrie for coming
**Schmidt**: …it says shit 3 times, yet you provide…
                    (Webex disconnected before 3 minutes expired)
**Ross**: Alright we'll go with Justin

**164.** When the Webex connection is terminated the speaker receives the below image:



**165.** Dr. Spiehs spoke via Webex on August 11, 2025, at the Board open meeting with

the following dialogue:

**Ross**: All right, we'll go with Justin
**Spiehs**: Can you hear me?
**Ross**: Yep
**Spiehs**: All right, so it sounds like your guys' COVID policies are the reason your enrollment numbers are down and declining. I tried telling you morons this would happen during Covid, but you and this entire community just dismissed me as a crazy person. Ain't that right, Aggedy, Raggedy Anne Costello? And speaking of morons, Gordon, you misgendered someone? Man, that's a big one. Does that make you a transphobe? I think that you, as a privileged white male who doesn't understand gender because of your cisgender, white, heteronormative male lived experience, that you should resign right here tonight for misgendering that person. And I think your fellow progressive feminist board members should also demand you resign as well. According to your school district's uh own policy, staff can be uh terminated for misgendering. By the way, is that policy legal? It doesn't seem like it. So, I want to talk to you guys about a petition I started uh that I want you guys to consider signing because the petition could help educate people on their First Amendment rights when speaking here at your meetings because you guys have repeatedly removed me and two others as we saw here just tonight uh strictly due to the words we speak during your general public comment. The name of my petition is the Fully Uncensored Communications At Meetings petition and the acronym is F-U-C-A-M and is pronounced fuck am…
(Ross interrupting): That's your warning, Justin
**Spiehs**: Well, Gordon, that's exactly what I want to talk about here this evening. So, every time I have said the name of my petition while speaking here during the meetings, I get warned and removed as we just saw right there. So, I went ahead and renamed my petition and the new name for my petition is Please Hear Us Communicating Our Messages and it has the number two right after it indicating this is the second edition or a renaming of the petition. So, that new acronym is P-H-U-C-O-M 2 and that is pronounced fuck am 2…
(**Ross** interrupting): All right. Thank you, Justin
**Spiehs**: …and so. Well, hold on. That…
       (Webex connection disconnected before time expired)

## AUGUST 25, 2025 MEETING

**166.** Mr. Eravi spoke via Webex on August 25, 2025, at the Board open meeting with

the following dialogue:

**Ross**: We'll start with Michael. Michael, are you there?

**Eravi**: Hello. It would be nice if I was able to be heard

**Ross**: We can hear you

**Eravi**: You wouldn't believe the kind of stuff we have to go through to get audible on your Webex. It's nice to see you guys acknowledging the fact that money is an issue. It's too bad that you and the, the teachers you've hired will end up costing us so much more. But I digress. Uh, your superintendent sent me an email after I had registered for public comment. I hadn't really uh seen the superintendent butt into those standard emails before, but she sent me an email and part of what she said was also, I'm advising you tonight, we will have students joining the meeting in the Webex room who will be speaking about their student experience in the district. I am requesting that you please refrain from creating a harassing environment there for them by writing inappropriate messages in the chat. So, uh, you know, I got to thinking about that email after she sent it to me and, and you know, the questions that came to mind were inappropriate, harassing. So I asked her, You mean like books in the district that describe fisting a teenage female's vagina while she's on her menstrual cycle? And I told her, I could remain well within that threshold set by you and the district. But you know, my real question to her is, which students are you trying to protect? Is it the elementary students that this district gave to Mark Gridley to abuse? Or is it the middle school and junior high kids that Patrick Naughton was placed with again, by this school district? Maybe it was Nick Burgoon, you know, the first of these three that you knew about. The one you let quietly go away so he could, you know, end up in charge of children in another school. It's obvious that Baker University had little knowledge of this when they hired him given the speed in which he left. This is the fucking problem with you people...

(**Ross** interrupting Eravi): ...that's your warning, Michael

**Eravi**: ...you want to have the false narratives carry the fucking day

(**Ross** interrupting) ...thank you

**Eravi**: ...ss long as I'm alive in this town, that will not fucking happen

     (Eravi removed from Webex before time expired)

**Ross**: We'll move on to Justin

**167.** Dr. Spiehs spoke via Webex on August 25, 2025, at the Board open meeting with

the following dialogue:

**Ross**: We're going to move on to Justin

**Dr. Justin Spiehs**: Can you hear me?

**Ross**: Yes

**Spiehs**: All right. My name is Dr. Justin Spiehs. You guys have an unconstitutional speaking policy here during your meetings that says no foul language can be used while speaking during public comment. And we saw that in action just right there when you removed Michael. But last meeting, you allowed a book from your school district libraries to be read that graphically and inappropriately described an

obscene sex act that is disgustingly called fisting. I can't think of anything more foul and obscene than what was read last meeting from that book that again is available to your students in your school district libraries. You repeatedly remove me and Michael and Carrie for saying cuss words here during public comment because you say students might be listening and in attendance so you therefore claim you need to protect their ears from foul language. But if that really is the case, if that really is your reason, then why do you allow books about fisting in your school libraries? And why did you allow that book about fisting to be read here during public comment? How do you square that circle? How could you possibly justify that? But since you do allow books to be read here without removing speakers, I want to read from a book I came across. It goes: Jay-Hopp and Donnie flew down the side street every now and then, looking back for the pursuing patrol cars that alerted the neighborhood to their to their presence. Fuck, they see us, Jay-Hopp shouted. Fuck those pigs, man. Keep going, Donnie said back. Just ahead, a second patrol car turned onto the side street, preventing the fugitives from fleeing any further. Now fully aware their run was over, Jay-Hopp and Donnie put their hands up. Jumping out of the patrol car, the officer screamed, You're under arrest by the authority of that bitch Kelly Jones and that dipshit Gordon Ross. The End
**Ross**: Thank you, Justin
**Spiehs**: I made that story up. So, since it's not an actual book…
**Ross**: We'll go to Carrie
(Spiehs' Webex feed is terminated prior to his 3 minutes of allotted speaking time)

**168.** Ms. Schmidt spoke via Webex on August 25, 2025, at the Board open meeting

with the following dialogue:

**Schmidt**: Okay, Alright. Board members, I have a question for you tonight after I read from two Colleen Hoover books, so please listen closely to its content. People at home know that this content is sexually explicit and contains words that this board deems obscene if anyone were to say it outside from reading it from the book. The first book I am reading from is titled Maybe Not.
I reach down to her thighs and spread her legs with my hand. I keep my eyes focused on her anyway as I slowly push two fingers inside of her, waiting for her to moan into her pillow. She doesn't make a sound, so I pull them out and re-enter her with three fingers this time. She pulls at my hair and spreads her legs for me, wanting me to bury myself inside of her. I do. I push her panties aside and shove into her so hard and fast, she lets out a moan. I take one of her breasts in my hands and bring it to my mouth. I slowly kiss my way down her stomach. Fuck woman. I smile triumphantly and press my lips to her stomach again. I start just below her belly button and trail slow kisses all the way down until I meet her panties. I hook my fingers into the waistband and pull them down. I lift her leg and press a soft kiss against her ankle, then her calf, then the inside of her knee, repeating the kisses all the way up her thigh. My tongue slides against her, separating her. My

fingers find their way back inside of her. I'm filling her, consuming her with my tongue, and she's taking every ounce of me she can get. Now she's pressing my face into her, begging me to go faster. Her hands leave my hair and meet me, and meet her headboard as she grips it tightly and locks her legs around my shoulders. I keep my fingers buried inside of her as she cries out my name with each tremor that racks her body. I kiss the inside of her thighs as I pull my fingers out of her.

The next book I am going to read from is titled Two More Days

Instead of serving the populace, you're going to be serving my vagina. I could've really been bad and said pussy, rather than vagina. Stuart's hand left my breast and slid down my abdomen to unbutton my dress pants. When his hands dipped into the waistband of my panties, I sucked in a breath. As he slid his fingers against my clit, he said, Mm, you're soaked. Arching against his hand, I murmured, Please." "Please what? Make me come. Stuart's answer was to slip, not just one but two fingers deep inside me. As he pumped them in and out, I began frantically moving my hips. I panted and moaned as I worked toward coming. When Stuart pushed, um,  in a third finger and swirled them to my G-spot, I came undone. Holy shit, Fuck yeah

Board Members, now on to my question I have for you. Which Colleen Hoover book that I just read from is in your district? As a hint, the book "Maybe Not" says ass 27 times, fuck 29 times, piss…

**Ross** interrupting): Thank you Carrie

**Schmidt**: …11 times and bitch 7 times. The book Two More….

(Schmidt's Webex feed is terminated prior to Schmidt's 3 minutes of allotted speaking time)

### THE PARTIES

**169.** Plaintiff Michael Eravi is a resident of the state of Kansas also residing in Douglas County, Kansas.

**170.** Kelly Jones, was a Board President and current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Jones is sued in her individual capacity.

**171.** Ronald Gordon-Ross is the Board President and current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Ross is sued in his individual capacity.

**172.** Bailey Salsbury is a police officer for the City of Lawrence. She is sued in her individual capacity.

**173.** Lindsay Bishop is a police officer for the City of Lawrence. She is sued in her individual capacity.

**174.** Jeanice Swift is a natural person who was hired by the Board of Education for the Lawrence Kansas School District as Superintendent of Schools for Lawrence USD 497 School District. She is sued in her individual capacity.

**175.** Unified School District No. 497, Douglas County, Kansas (USD 497). USD 497 is a school district in Douglas County, Kansas.

**FIRST CAUSE OF ACTION**
**(NOTICE AND OPPORTUNITY TO BE HEARD)**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AGAINST ALL DEFENDANTS**
**(42 U.S.C. § 1983)**

**176.** Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

**177.** If a government policy fails to provide the kind of notice that will enable a person of ordinary intelligence a reasonable opportunity to know what is prohibited, such policy is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment,

**178.** "Warnings" declared by a presiding board member are deceptive and punitive. They are punitive because they are viewpoint based and discriminatory. They are given because of the plaintiff's protected expressive speech and conduct. These

warnings are a pretext for suppression of the plaintiff's speech protected by the First Amendment.

**179.** The warnings are coercive and punitive because a second "warning" results in the harsh treatment of not only loss of speaking time but ejection from the meeting, then the entire building. Thus, each warning is merely a scattergun exercise implicating all speech rules. As such each warning does not inform the speaker what policy, if any, was violated and how, the plaintiff either self-censors or has to guess as to what the claimed violation was factually based upon or how it violated any speech rule.

**180.** These presiding board members have failed to follow fair procedures when attempting to, and in fact do deprive, the plaintiff's liberty and property interests.

**181.** Warnings are misleading, coercive, and deceptive because when a presiding board member gave a "warning" there was no explanation as to what policy, if any, was purportedly violated. Mr. Eravi was left in the dark as to how his speech or conduct that was being "warned" about violated any rule or policy and as such denied Mr. Eravi due process in understanding or in modifying his speech or conduct.

**182.** Thus these purported "warnings" denied the plaintiff of information regarding the presiding board members charge or asserted violation and denied the plaintiff an opportunity to present his side of the story or challenge the accusation.

**183.** The terms "bullying," "complaint," "disrespectful" and "foul language" as the Board policy's prohibitions violate the First Amendment both facially and as applied,

the prohibition on disrespectful and foul language is unconstitutional as applied, and all prohibitions are void for vagueness.

**184.** Due to the presence of law enforcement officers in the meeting room and the practice by presiding Board members or Superintendent Swift of directing, commissioning, or ordering speakers to leave not only the meeting but the entire building—with police assistance—the plaintiff could reasonably believe that each defendant might retaliate against him with criminal sanctions if he fails to comply with those directives.

**185.** None of the words spoken by Mr. Eravi are "obscene" as defined by Kansas law. Instead, the defendants wrongfully apply the legal standard for obscenity to common profanity or formal biological terms.

**186.** These regulations unlawfully target and restrict offensive speech, constituting viewpoint discrimination.

**187.** Defendants cannot interrupt, silence, or expel speakers from school board meetings for voicing purportedly offensive speech by labeling it a "complaint," "disrespectful," or by misapplying legal prohibitions on "foul" speech—whether quoting school library books or using formal biological terms. Moreover, individuals cannot silence each other in a public forum merely because they take offense. The First Amendment expressly prohibits a heckler's veto.

**188.** A purported "complaint" targets only negative speech, while allowing positive speech on the same subject or about the same person, constituting classic viewpoint

discrimination. These prohibitions present a continuing threat designed to chill or suppress the plaintiff's protected speech.

189. Mr. Eravi intends to continue speaking at Board meetings, engaging in the same protected speech, but he fears further censorship and repression as a result. This fear has caused Mr. Eravi to consider self-censorship, undermining his First Amendment rights.

190. The prohibitions against "complaints" and "disrespectful" speech are facially unconstitutional because they are based on viewpoint discrimination and operate as a covert ban on offensive speech. Likewise, the prohibition on "foul language" is unconstitutional as applied, particularly when it restricts the reading of portions of books from the USD 497 school libraries.

191. Regardless of how "complaints," "disrespectful," and "foul speech" are defined, such expressions constitute protected speech. Moreover, it is legally impossible to "disrupt" a Board meeting when a speaker is exercising their right to speak during their allotted time.

192. Policy BCBI references "rules for public comment" but fails to provide public notice of what those rules entail. The BCBI policy itself does not publish any speaking restrictions for public comments at open meetings. Instead, it states only that "The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself."

193. There is no indication in the USD 497 agenda or minutes that any such "rules for public comment" possessed by the clerk have been voted upon or approved by a

majority of USD 497 Board members. Neither the Board, its clerk, nor the presiding President has the authority to create ad hoc public speaking rules without formally placing those rules on the agenda, conducting a proper discussion, and obtaining a majority vote. Therefore, no valid rules exist limiting the subject matter or content of speech at USD 497 open Board meetings.

**194.** Instead of providing clear notice or codifying these rules in its published policy manual, the Board attempts to impose rules for public comment under an inapplicable policy governing long-range goals for guiding district operations.

**195.** To constitute official Board policy—including rules governing public comments—the Board has established clear requirements that do not authorize defendants Jones or Ross to unilaterally impose additional restrictions or guidelines on individuals speaking during the Board's open meetings.

**196.** Nowhere in any Board policy is there authority granted to defendants Ross or Kelly to ban individuals from speaking at or attending Board meetings, to terminate Webex connections, or to otherwise restrict these rights simply because a speaker used words such as "bitch," "shit," "shitty," "fuck," or "motherfucker."

**197.** The plaintiff presented no emergency or threat to safety at any time during the events described in this Complaint.

**198.** Each defendant has deprived this plaintiff of a property and liberty interest without due process of law.

**199.** Procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner before depriving an individual of their rights.

**200.** The policy, custom, and practice of using Lawrence City police to enforce defendant Jones's speaking policies wrongly criminalizes what is essentially a Board speech rule violation. Banning an individual not only from the open meeting but from the entire building is irrational, excessive, and denies any due process for such severe consequences. These policies and practices are therefore unconstitutionally void and unenforceable, violating the First Amendment rights of free speech and petition, as well as the Fourteenth Amendment's guarantee of due process against vague and arbitrary laws.

**201.** As these areas are traditional public forums, the government's ability to restrict expressive activity is severely limited and subject to strict scrutiny. Neither these policies nor the municipal code, nor their enforcement, provide any procedures to give notice or allow contesting adverse actions. It is a blatant violation of due process that these presiding officials or the city manager would implement a policy and custom whereby public speakers like the plaintiff can be stripped of their First Amendment rights without any opportunity to be heard.

**202.** And given that the board members – led by its president –purportedly empowered a single presiding board member to unilaterally exclude individuals and declare criminal trespass, fully aware that such actions carry severe criminal

consequences, this policy and custom dangerously open the door to arbitrary, retaliatory, and ad hoc deprivation of constitutional rights.

**203.** The plaintiff has been damaged.

**SECOND CAUSE OF ACTION**
**AS APPLIED CHALLENGE SEEKING DECLARATORY AND INJUNCTIVE RELIEF AGAINST DEFENDANTS USD497, SWIFT, JONES, AND ROSS**
**( 42 U.S.C. § 1983)**

**204.** Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

**205.** The right to petition the government for a redress of grievances stands as one of the most cherished liberties safeguarded by the Bill of Rights and holds a place of paramount importance within the hierarchy of First Amendment protections. This right is so fundamental that it is implied by the very concept of a government that is republican in form.

**206.** A petition may take the form of a personal grievance addressed directly to the government and can be expressed orally.

**207.** The public comment period at school board meetings serves as a vital forum through which individuals exercise their fundamental First Amendment right to petition their elected representatives.

**208.** All of the plaintiff's public speech during Board meetings is fully protected under the First Amendment right to petition the government for redress of grievances.

**209.** As applied against the plaintiff, the Board's speech rules and practices— regarding complaints, being "disrespectful," and the interpretation of protected speech as "dangerous," "unsafe," "obscene," or "foul language" – violate and continue

to violate the plaintiff's First Amendment right to petition by impermissibly discriminating against his viewpoints.

**210.** These speech rules and practices also violate the plaintiff's First Amendment rights because they are not reasonable in light of the purpose of the public comment period. Petitioning a school board necessarily requires referencing individuals—especially board members—questioning them, and repeating words found in the school curriculum.

**211.** The BCBI policy contains no publicly accessible speaking restrictions for the public comment portion of an open meeting. Instead, it states that "rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself," leaving the public without clear, accessible notice.

**212.** While the BCBI policy purports to restrict board members Jones and Ross in their interactions with speakers, both repeatedly violate these restrictions by interrupting speakers during their allotted speaking time, as detailed in this Complaint.

**213.** The speaking restrictions imposed by USD497 president Ross and Jones attempt to restrict "foul" language—a term whose definition remains unknown, overbroad, and inconsistently applied.

**214.** This forum is a designated public forum.

**215.** The BCBI policy contains no restrictions on "foul" language or the use of words such as "bitch," "shit," "shitty," "fuck," or "motherfucker."

**216.** As applied to the plaintiff by defendant Jones, the BCBI policy is unconstitutionally vague, with numerous applications that are largely unconstitutional and fail to substantially outweigh the legitimate scope of protected speech. The current speaking policies practiced, created, or enforced by defendants Swift, Jones, and Ross impede the plaintiff's ability to speak, create, publish, and distribute speech. These restrictions chill the plaintiff's speech by preventing him from fully benefiting from public speaking and from attending meetings in person.

**THIRD CAUSE OF ACTION**
**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH**
**VIEWPOINT DISCRIMINATION AND RETALIATION AGAINST SALSBURY AND BISHOP**
**(42 U.S.C. § 1983)**

**217.** Plaintiff Michael Eravi repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

**218.** At all times, Mr. Eravi maintained civility and never threatened the safety of any board member, including defendant Kelly, nor did he do so in the presence of Officers Salsbury or Bishop. Mr. Eravi's video evidence shows he remained peaceful, respectful, and posed no threat to anyone.

**219.** Neither Salsbury nor Bishop observed Mr. Eravi committing any crime.

**220.** Mr. Eravi was not engaged in any criminal conduct, including disorderly conduct or trespass, when speaking at the meetings or when speaking to defendant Jones in the parking lot.

**221.** There was a policy, custom, and practice of granting presiding board members the authority to trespass individuals appearing at the board meetings, solely at the discretion of the board president, without other justification. This practice, coupled

with Lawrence City Police acting as enforcers of the Board's speech rules or the presiding board member's preferences, is unconstitutionally void and unenforceable as it violates the First Amendment rights to free speech and petition, as well as the Fourteenth Amendment's guarantee of due process against vague laws.

**222.** Defendants Salsbury and Bishop, by their uniformed and armed presence, communicated authoritative and coercive commands that demanded unqualified obedience.

**223.** Salsbury and Bishop treated the Board's meeting room and parking lot as though they were private property for purposes of enforcing state criminal trespass statutes.

**224.** Upon information and belief, Officers Salsbury and Bishop were advised or instructed prior to the events that the meeting room would be treated essentially as private property; specifically, that if a board member or presiding board member wanted an individual removed, Salsbury and Bishop were to enforce that directive.

**225.** Their actions, as described in this Complaint, were carried out as part of a de facto policy, practice, custom, or usage under color of state law.

**226.** The actions of USD497, Swift, Jones, and Ross – along with Salsbury and Bishop – effectively conferred full police authority of the state on an independent actor to carry out and enforce an arbitrary and discriminatory policy aimed at punishing individual free speech solely based on the content or viewpoint being expressed.

**227.** None of the defendants were authorized or had the liberty to alter the traditional public forum status of the meeting room, building, or parking lot areas, even temporarily.

**228.** Officers Bishop and Affalter were assigned by the City of Lawrence to enforce and carry out, under threat of arrest, the silencing or removal of the plaintiff from this traditional public forum encompassing the meeting room, building, and parking lot.

**229.** Bishop and Salsbury committed these acts – including threats of force and arrest – with careless and reckless disregard, or with deliberate indifference, to the plaintiff's clearly established constitutional rights to free speech and assembly as protected by the First Amendment of the United States Constitution.

**230.** Restricting or treating viewpoints differently, or according them less protection as a matter of policy, constitutes viewpoint discrimination.

**231.** As a proximate result of each of the defendants Salsbury and Bishop's respective actions, the plaintiff has suffered, embarrassment, humiliation and other pecuniary loss for which he is entitled to an award of compensatory damages.

**FOURTH CAUSE OF ACTION**
**RIGHT OF FREE SPEECH, RETALIATION U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983**
**AS-APPLIED CHALLENGE TO THE PUBLIC PARTICIPATION POLICY AGAINST USD497,**
**KELLY JONES, RONALD ROSS, AND JEANINE SWIFT**

**232.** Plaintiff restates and incorporates by reference the allegations in the above paragraphs.

233. Mr. Eravi engaged in constitutionally protected speech by attending open public meetings of the Board of Education to voice his opinions and express disagreement with Defendants' policies and actions.

234. Mr. Eravi was prevented, chilled, and inhibited from exercising his constitutionally protected First Amendment rights as a result of the Ban, which barred him from attending and speaking at open public meetings of the Board of Education, public sporting events, and other activities held on School District property.

235. By removing or banning Mr. Eravi from these meetings, Defendants violated his free speech rights under the First Amendment, as the Ban unlawfully restrained his speech and participation in a public forum concerning matters of public interest and concern.

236. Restrictions on speech in limited public forums must be both reasonable in light of the forum's purpose and viewpoint neutral.

237. The Ban burdened substantially more speech than necessary to achieve any legitimate interest of the School District, failed to leave open adequate alternative channels for expression, and was unreasonable given the purpose of the forums.

238. Defendants' knowledge of Mr. Eravi's criticisms, along with the timing and duration of the Ban, demonstrate that the Ban was motivated by Defendants' disagreement with Mr. Eravi's opinions and criticisms of School District policies and actions, constituting unlawful viewpoint discrimination.

**239.** The Ban imposed on Mr. Eravi further constituted an unconstitutional prior restraint on his speech by prohibiting him from speaking at Board meetings unless he first obtained permission from Superintendent Swift.

**240.** This permission requirement vested unfettered discretion in a single official, thereby constituting an unlawful prior restraint on Mr. Eravi's speech in violation of the First Amendment.

**241.** As a result, Mr. Eravi was forced to alter or refrain from engaging in constitutionally protected activities to avoid further retaliation or adverse consequences from the School District.

**242.** Until enjoined by this Court, Defendants continued to enforce the Ban in violation of Mr. Eravi's First Amendment rights.

**243.** It is clearly established law that any restrictions on speech in a limited public forum must be reasonable and viewpoint neutral. A ban is only constitutionally permissible under circumstances involving genuine threats, repeated harassment, or consistent disruption – none of which occurred here.

**244.** Defendants have engaged in retaliatory viewpoint discrimination against Mr. Eravi, a practice that is plainly unconstitutional. Viewpoint discrimination is categorically prohibited and recognized as a well-settled violation of the First Amendment in all public forums. Mr. Eravi was repeatedly interrupted and censored during his allotted public comment time, both in person and via Webex.

**245.** Accordingly, any reasonable government official would have understood that terminating Mr. Eravi's speech—whether in person or remotely—by cutting off his

microphone, removing him from the premises, and ultimately banning him for life, absent any showing of unsafe or threatening behavior, solely due to the viewpoint expressed, was a direct violation of his First Amendment rights. These actions constitute unlawful viewpoint discrimination, regardless of whether they were claimed to be carried out under any purported Board policy.

**246.** The protections of the First Amendment, as incorporated against state actors through the Fourteenth Amendment, unquestionably extend to public speech at school board meetings.

**247.** It is axiomatic that criticism of school officials, district employees, policies, regulations, budgets, and curricula lies at the heart of what is germane to the business of school boards. That such speech may be uncomfortable, unwelcome, or inconvenient to Board members does not strip it of constitutional protection. The First Amendment prohibits the suppression of such viewpoints, particularly when expressed in a designated or limited public forum like a Board meeting.

**248.** All of Plaintiff's public comments at Board meetings constitute core political speech and are fully protected by the Free Speech Clause of the First Amendment.

**249.** At no time did Defendants censor or terminate Plaintiff's speech for exceeding time limits, violating forum neutrality, disrupting the meeting, or engaging in legally obscene speech. Instead, Plaintiff's speech was silenced solely because Defendants disagreed with the viewpoint expressed – an unconstitutional act of content and viewpoint discrimination.

**250.** As applied to Plaintiff, Defendants' policies and practices prohibiting "disrespectful" speech, "complaints," and undefined "foul" language constitute impermissible viewpoint discrimination in violation of the First Amendment. These restrictions were not enforced neutrally but instead targeted Plaintiff's protected speech precisely because of its content and critical viewpoint.

**251.** As applied to Plaintiff, Defendants' customs, practices, and especially the so-called "two-warning" system are unconstitutional. These vague and subjective prohibitions are not reasonable in light of the purpose of the public comment forum. Meaningful commentary on school curricula and materials – especially books made available to young students – necessarily involves referencing language or content that the District itself has deemed appropriate for minors. Punishing adults for quoting or criticizing that same content in public comment is viewpoint discrimination in its clearest form.

**252.** Defendants do not require members of the public to seek prior approval from USD497 in order to attend religious services held on school property—except for Ms. Schmidt, who has been singularly and discriminatorily burdened with that restriction.

**253.** Defendants allow the public to attend church services or religious events occurring on USD497 property – except for a select group of individuals, including Dr. Spiehs, Ms. Schmidt, and Mr. Eravi, who have been singled out and banned. This selective enforcement underscores the retaliatory and discriminatory nature of the Ban.

254. Defendants were well aware of Mr. Eravi's pointed criticisms. Rather than respond in kind through public discourse or defend their policies on the merits, they responded with censorship. Shortly after Mr. Eravi voiced his objections, Defendants silenced him – banning him not only from speaking at public meetings, but also from attending community events such as athletic games held on public property. This ban also effects Mr. Eravi's livelihood as he must decline paying tow jobs that originate on USD497 property.  This punitive exclusion, rooted in disagreement with his viewpoint, is a flagrant violation of the First Amendment.

255. Defendants imposed a lifetime ban on Mr. Eravi from attending open public meetings of the Board of Education and from entering other USD497 property in direct retaliation for his constitutionally protected speech. This extreme and punitive action was not the result of any safety concern or criminal conduct but a calculated response to silence dissent.

256. The Ban was explicitly motivated by Mr. Eravi's public criticisms of Superintendent Swift, the School District, and Board policies—speech that lies at the core of First Amendment protection. His consistent participation in Board meetings and vocal opposition to District decisions triggered a retaliatory campaign to exclude him from public spaces and silence his voice.

257. Conditioning Mr. Eravi's right to access public property – including public meetings and religious services – on his submission of a request for permission constitutes an unconstitutional prior restraint. Mr. Eravi has a legal right to engage in expressive activity on public property – including attendance at church services

97

held on District grounds – without being subject to discretionary gatekeeping by Defendants.

**258.** Defendants selectively enforced their speech policies and practices to favor speakers who praised the District, its curriculum, or its leadership, while targeting and punishing Mr. Eravi for expressing opposing views. By threatening him with criminal prosecution, physically removing him from Board meetings and public property, banning his future access, and requiring special permission to attend even religious services – USD497, through its officials including Defendants Swift, Jones, and Ross, acting under color of state law—violated Mr. Eravi's rights to freedom of speech and due process under the First and Fourteenth Amendments to the United States Constitution.

**259.** Accordingly, Plaintiff seeks relief under 42 U.S.C. § 1983, including nominal damages, declaratory relief, and preliminary and permanent injunctive relief to enjoin the continued enforcement of Defendants' unconstitutional customs, policies, and practices. Plaintiff further seeks reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

A. Declaratory and injunctive relief as set forth in all counts of this Complaint, including an order enjoining Defendants from further enforcement of

unconstitutional policies, practices, or customs that infringe upon Plaintiff's rights under the First and Fourteenth Amendments.

B. An award of compensatory damages in excess of $75,000 for the violations of Plaintiff's rights under the United States Constitution and applicable state law, to redress the harm caused by Defendants' unlawful actions.

C. An award of nominal damages to recognize the violation of Plaintiff's constitutional rights, even in the absence of measurable economic harm.

D. An award of punitive and exemplary damages against each individual Defendant in their individual capacity, in an amount to be determined by the jury, based on allegations of conduct undertaken with evil motive or intent, or with reckless or callous indifference to Plaintiff's clearly established constitutional rights.

E. An award of Plaintiff's reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, and any other applicable law.

F. Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff